LOUISA E. RANDLETT *vs.* WILLIAM E. RICE, administrator.

Essex. Nov. 6, 1885. — March 31, 1886. FIELD & DEVENS, JJ., absent.

A man married A. in Vermont in 1836, and lived with her there until 1863, when he went to Canada with B., by whom he had a child, whom he always afterwards recognized as his son, and who bore his name. B. died the same year. In 1864, he went through the form of marriage with C. in New Hampshire, and lived with her for several years, she supposing she was his wife. In 1866, A. died. In 1867, he married D. in this Commonwealth, and lived with her as well as with C. for nearly a year, until D.'s discovery of his relations with C., when D. ceased to live with him, he acknowledging to her that C. was his wife; and he then went back to C. and lived with her for many years in New Hampshire and Maine, recognizing her as his wife. In 1880, D., while the man whom she married in 1867 was living, but of whom she had not heard since he left her, married another man, supposing her former marriage to be void. Neither C. nor D. knew of the existence of A., and A.'s husband had no knowledge of her death until after the events above set forth. On the death of the man whom D. married in 1880, she filed a petition in the Probate Court for an allowance from his estate as his widow. *Held,* that there was no presumption of law that the man so many times married was divorced from A. before his marriage to C., or was legally married to C. after A. died, and before his marriage to D., or that he obtained a divorce from D. before she married again in 1880; and that the facts would not, in favor of D.'s innocence, permit such inferences of fact to be drawn; that D's marriage in 1867 was a valid marriage, and the one in 1880 invalid; and that her petition must be dismissed.

APPEAL, by the administrator of the estate of Thomas L. Randlett, from a decree of the Probate Court allowing $1500 to

Louisa E. Randlett, as the widow of the intestate, upon her petition for an allowance out of the estate of her deceased husband, under the Pub. Sts. c. 135, § 2.

The appellant specified the following reason for appeal : " Because at the time of her alleged marriage to said Thomas L. Randlett she had a lawful husband then alive, whose name is Ira Alexander, and therefore the alleged marriage with Thomas L. Randlett was illegal and void, and she is not his widow."

The case was heard by *Morton*, C. J., who found that the petitioner was not legally married to Thomas L. Randlett, and ordered that her petition be dismissed; and, at the request of the petitioner, reported the case to the full court, in substance as follows :

There was evidence tending to show that Ira Alexander Haven had resided in Vermont in the year 1836, and that on the twentieth day of January of that year, he married one Emeroy Horton, and that they lived together for several years as man and wife, and had two children; that, in the year 1863, Haven fled the country to Canada with another woman, with whom he lived there and by whom he had a child, who was born in 1863, the mother dying soon after the birth of the child. It did not appear whether any ceremony of marriage took place between this child's mother and his father, who had changed his name to Ira Alexander, by which name he has always since been known. The father acknowledged the child as his; he has since borne his name and lived with him and been brought up by him as his child, is still acknowledged by him as his child, and still lives with him. The boy appeared in court and testified that he was his son. No proceedings of affiliation of this son in Canada or elsewhere were shown.

There was also evidence tending to show that said Alexander left Canada and came to Portsmouth, New Hampshire, late in the year 1863, and worked in the Navy Yard there from May, 1864, to January, 1866 ; that, when he came to Portsmouth, he boarded in the family of the father and mother of Mary Jane Dennett, then a single woman of thirty years of age; that Alexander paid said Mary Jane such attentions as are usual between persons intending marriage, between one and two years; that one morning in December, 1864, said Alexander and Mary Jane

left the house and rode away, saying that they were going to Great Falls in said State to get married; that they returned at night, and Alexander introduced Mary Jane to her father and mother as his wife in the following language: "Your daughter is my wife; she is now Mrs. Alexander;" and that that night Mary Jane did not room with her former room-mate, but slept with Alexander.

Mary Jane Dennett testified, in her deposition, in regard to her marriage with Alexander, that there was a ceremony, and they were pronounced man and wife; that she could not tell whether the person performing the ceremony was a clergyman; that she supposed at the time that he was; that she supposed she was married until Alexander left her; that she had got no certificate, and had now no doubt that the person performing the ceremony was "one of those awful spiritualists, free lovers," but she did not know anything about it; and that she and Alexander lived together about nine years, she supposing she was his wife.

Mary Jane, after the supposed marriage with Alexander, took charge of his young son, treating him as if his mother. Alexander introduced Mary Jane as his wife to their acquaintance; they attended church together as man and wife, and received visits from their pastor, who was a witness and testified to that fact. They also kept house as man and wife, and she was known and reputed as his wife from that time, and he was not known in Portsmouth to have had or to have any other wife until he left in 1868, when he took Mary Jane and his boy with him and went to Lewiston, Maine, where they also lived as man and wife; and, while in Maine, Alexander had a real estate transaction in which she was called upon to release her dower in the estate which he conveyed, and did so, receiving a portion of the purchase money as a consideration for the release; and this was as late as the year 1871 or 1872.

There was also evidence tending to show that Emeroy Haven remained at her father's house in Vermont, and died on March 7, 1866.

There was also evidence tending to show that the petitioner, being then single, married Emory Ayres in 1860, and lived with him in Rhode Island until January 30, 1866, when he died; that

after his death she came to Newburyport to live; that in the latter part of 1866, Alexander came to work as a ship-carpenter, which was his trade, at Newburyport, and remained at work there during that year and the following year, being accustomed to return to Portsmouth on Saturday night, spending Sunday, as he said, with his child; that, while so working in Newburyport, he made the acquaintance of the petitioner, and that acquaintance ripened into courtship, he always claiming to be an unmarried man, until September 11, 1867, on which day they were in due form married at Lynn, and then came to live as man and wife in Newburyport at the house of the wife, where they continued to live until June 23, 1868, at which time Mary Jane Dennett came to the house of the Alexanders when the husband and wife were at the table eating their meal, and said to the petitioner, in the presence of Alexander, "I am as much Mrs. Alexander as you are, and have better claims to him," to which the petitioner replied, "I have a marriage certificate, show me yours;" that thereupon Mary Jane Dennett burst into tears and left the house; that the petitioner said to Alexander, "What does this mean? Is this woman your wife? Were you married to her when you married me?" He admitted that fact. She then said to him, "Go, leave me, and don't let me ever see you again." Alexander then went into the house of a near neighbor, and, crying, said, "I must go, or she will shut me out; I have another wife living." And he went, and she never saw him or heard of him from that day until after this petition was filed in the Probate Court. The petitioner immediately applied to counsel in Newburyport, and stated to him the fact, and asked him if it was necessary to obtain a divorce, and he replied that, as her marriage with Alexander was void, there was no need of divorce proceedings; and thereupon she resumed the name of Ayres, and was thereafterwards known by that name until she married Randlett.

There was also uncontradicted evidence tending to show that the petitioner had never heard of Emeroy Horton Haven, the first wife of Alexander, whether living or dead, until after the probate proceedings; that Alexander had never heard of his wife, whether alive or dead, from the time of his desertion of her until after the probate proceedings; and that Mary Jane Dennett had ·

never heard of Mrs. Haven, nor whether she was living or dead, and that she did not know of the change of name by Alexander.

There was also evidence tending to show that Alexander had represented, prior to his taking Miss Dennett to Great Falls, that he was a widower, and that his wife had died in Canada, leaving this child.

There was also evidence tending to show that, after Alexander had left Newburyport never to return there, Mrs. Ayres continued to live there for more than twelve years, and in the latter part of the time made the acquaintance of Thomas L. Randlett, for many years a resident of Newburyport, and then unmarried, which acquaintance ripened into courtship, and they were married at Newburyport on January 8, 1880, by Mr. Randlett's pastor, the Rev. Dr. S. E. Spaulding, who testified to the subsequent married life of Randlett and his wife, in the following words: " Mr. Randlett always spoke in the highest terms of Mrs. Randlett, formerly Mrs. Ayres, and said many times how happily they lived together."

Mrs. Randlett, being called as a witness, testified that, after Mr. Randlett made proposals of marriage, she stated to him all the facts in relation to her connection with Alexander, and told him to investigate them and satisfy himself about them, and to get legal advice if she ought to marry him, and if then he was satisfied and desired to marry her, she would marry him; that shortly afterwards Mr. Randlett called upon her, stating that he had fully investigated the relations between her and Alexander, and was entirely satisfied with her conduct; that he had consulted a lawyer upon the question whether he had a right to marry her, and that he had investigated the matter, and given an opinion that he had a right to marry her; that then she accepted him, and the marriage took place; that Mr. Randlett gave her the name of the lawyer whom he consulted, which name she gave, and no evidence was produced to control in any manner her statement. She also testified, and her evidence was not contradicted, that she had never heard of Alexander, whether he was alive or dead, since he left her house when she told him to go, nor could Mr. Randlett obtain any information of him.

There was also evidence tending to show that Mr. Randlett died on July 13, 1883, and that at the time of his death she was

recognized by the family as his widow, was asked by the admin-
istrator and the children to yield her right to administer to the
administrator, and as the widow of Randlett signed the petition
that Rice be appointed administrator; that in the proceedings
before the Probate Court no intimation was made that she
was not his widow, and the first that she knew there was any
question upon the subject was upon reading the reason of the
appeal.

*B. F. Butler*, (*P. Webster* with him,) for the petitioner.   1. A
marriage of the petitioner to Randlett, in 1880, is admitted.
The only fact upon which the administrator relies, to invalidate
this marriage, is the admitted fact that the petitioner was mar-
ried to Alexander in September, 1867, more than twelve years
before she married Randlett, and that Mrs. Alexander Haven,
once the wife of Alexander, died on March 7, 1866.

If necessary to sustain this marriage, the law in favor of in-
nocence presumes a divorce of Emeroy Haven from Alexander,
he having been gone from her to parts unknown for thirteen
years.  *Blanchard* v. *Lambert*, 43 Iowa, 228.  *Hull* v. *Rawls*,
27 Miss. 471.  *Carroll* v. *Carroll*, 20 Texas, 731.  *Caujolle* v.
*Ferrie*, 26 Barb. 177, 185.

In the case at bar, after thirteen years of absence, without
tidings, and after investigation to learn the facts as to Alexan-
der, the petitioner's marriage was a lawful and authorized act,
and whoever avers against it must prove, not one fact, as has
been done in this case, tending to prove that it was unlawful,
but each and every fact which must be found, whether affirma-
tively or negatively, to show that it was unlawful.

The petitioner produced evidence of this state of facts : Alex-
ander left his wife in Vermont, and went to Canada with another
woman, by whom he had a child, and with whom he lived as her
husband in Canada till she died.  To this child he gave his
name, and fully recognized him as his legitimate son.  He came
to Portsmouth, New Hampshire, and there represented himself
as a widower and the father of this child, and married in 1864,
and lived with Mary Jane Dennett openly as his wife for years
in the city of Portsmouth, and they were fully reputed and recog-
nized in that relation in the community.  After the form of mar-
riage between Alexander and the petitioner at Lynn, and while

they were living together, this Portsmouth woman claimed her husband of the petitioner. He acknowledged that claim to be just and true, and was driven from her house because thereof, by the petitioner, and never applied to her afterwards.

In favor of innocence, will not the court, finding a marriage with Mary Jane Dennett fully acknowledged by Alexander both by act and word, with the presumption strengthened by the fact that, prior to his marriage with her, he had lived with another woman as his wife in Canada, presume, in favor of that marriage and the innocence of his Portsmouth wife, that there was a divorce from Emeroy Haven in Vermont, or some other impediment? Every act of Alexander and every act of the parties is in consonance with this presumption. Mrs. Haven never made any claim upon Alexander, so far as is known. His acts in Canada, where no ceremony is requisite under the English common law, his recognition of his boy, — strong evidence that he is not illegitimate, as on the stand he swore that he was not, — would all support this presumption, and thus leave Mary Jane Dennett the wife of Alexander, who has lived with him as such for some nine years. To this marriage with Mary Jane Dennett and to the marriage with the woman in Canada the administrator opposes nothing but the marriage, in 1836, of Alexander with Emeroy Haven, and the fact that she was alive till March 7, 1866. If the court will presume in favor of the marriage of Mary Jane Dennett what many courts have presumed in such cases, then Alexander was her husband, and the marriage in Lynn with the petitioner is voidable on her part, and her marriage with Randlett in January, 1880, repudiated and avoided it, as her driving Alexander from her house had done before. *Valleau* v. *Valleau,* 6 Paige, 207. *Wilkinson* v. *Payne,* 4 T. R. 468. *Purcell* v. *Purcell,* 4 Hen. & Munf. 507.

2. There is another presumption which makes the marriage of the petitioner with Randlett valid. If there was a marriage between Mary Jane Dennett and Alexander before September 11, 1867, the date of the marriage at Lynn, then the marriage at Lynn was void. Suppose that the marriage of Alexander with the woman in Vermont remained in force till the Haven woman died, March 7, 1866, and that therefore up to that time the cohabitation of Alexander and Dennett was unlawful because of

the marriage of Alexander and Haven in Vermont, the fact is that cohabitation had its inception under the form of marriage, and Alexander and Dennett lived together and cohabited as husband and wife, in Portsmouth, until some time in 1868, when they took the boy and went to Maine, and there continued the same conjugal relation. The Dennett woman continued to bear his name; they were openly declared to be man and wife, declared themselves to be such, acted as such, and were received and recognized as such in Portsmouth as well as in Lewiston.

By the law of New Hampshire such continued cohabitation was not only evidence of a marriage, but marriage in itself, and the validity of this marriage must be tested according to the law of New Hampshire, where marriage is a mere civil contract, and where no solemnization whatever is necessary. *Londonderry* v. *Chester*, 2 N. H. 268. *Clark* v. *Clark*, 10 N. H. 380. *True* v. *Ranney*, 21 N. H. 52. *Keyes* v. *Keyes*, 2 Foster, 553. *Hampstead* v. *Plaistow*, 49 N. H. 84, 98. *Commonwealth* v. *Lane*, 113 Mass. 458.

The statutes of New Hampshire do not expressly take away the common law right of marriage. No express act having been passed, the presumption is that the Legislature did not so intend by its action regulating the formalities of marriage. *Meister* v. *Moore*, 96 U. S. 76. *Parton* v. *Hervey*, 1 Gray, 119.

There is no foundation for the argument that the mutual consent must of necessity be referred to the commencement of the cohabitation. The sounder principle is, that you must infer the consent to have been given at the first moment when you find the parties able to enter into the contract. *Campbell* v. *Campbell*, L. R. 1 H. L. (Sc.) 182, 201, 207, 208, 212, 215.

The fact that the cohabitation began under a formal ceremony, wherein Mary Jane Dennett was entirely innocent, rebuts any inference that she would consent to an illicit connection.

A marriage by living together under the law of New Hampshire, where no solemnization is required to its validity, is contracted, and is to be inferred from that fact as from any other form of marriage. This is the law where no solemnization is required. *De Thoren* v. *Attorney General*, 1 App. Cas. 686, 688, 694. *Fenton* v. *Reed*, 4 Johns. 52. *Rose* v. *Clark*, 8 Paige, 574. *Donnelly* v. *Donnelly*, 8 B. Mon. 113. *Jackson* v. *Claw*,

18 Johns. 346. *North* v. *North*, 1 Barb. Ch. 241. *Starr* v. *Peck*, 1 Hill, (N. Y.) 270. *Breakey* v. *Breakey*, 2 U. C. Q. B. 349, 359.

A common law marriage is sustained by the laws of other States, as it is by the decisions of the Supreme Court of the United States. 2 Kent Com. 87. *Fenton* v. *Reed*, and *Jackson* v. *Claw, ubi supra. Hervey* v. *Hervey*, 2 W. Bl. 877. *Bissell* v. *Bissell*, 55 Barb. 325. *Peck* v. *Peck*, 12 R. I. 485. *Meister* v. *Moore*, 96 U. S. 78. *Maryland* v. *Baldwin*, 112 U. S. 490.

That marriage might be contracted by mutual promises alone, *sponsalia de presenti*, was an established principle of civil and canon law antecedent to the Council of Trent. *Hallett* v. *Collins*, 10 How. 174, 181.

If this court holds the law of New Hampshire as its own courts hold it, then there was a lawful marriage, according to the laws of that State, existing between Alexander and Dennett at the time he inveigled the petitioner into the marriage in Lynn, and that marriage was void.

3. When the Randlett marriage was contracted, it was valid on the part of the petitioner. For over eleven years she had heard nothing of Alexander; and it should be presumed that during that time Alexander had procured a divorce, or in some way released himself of his marriage tie. The law presumes everything to have been done which could be done to render that marriage in 1880 legal.

*R. M. Morse, Jr. & A. Noyes*, for the administrator.

W. ALLEN, J. The only question is whether the petitioner had a lawful husband alive when she married the decedent, in 1880.

She was married in 1867, in this State, to one Ira Alexander, who is still living. The petitioner contends that that marriage was invalid, for the reason that Alexander then had a wife living. He was married in 1864, in Portsmouth, New Hampshire, to a woman with whom he was living as his wife in Portsmouth at the time of his marriage to the petitioner, and he continued cohabiting with both for nearly a year, until the discovery by the petitioner of his relations with the other woman. The administrator contends that the marriage of Alexander at Portsmouth in 1864 was void, for the reason that he then had a wife

living.  He was married in 1836 in Vermont, left his wife there in 1863, and went to Canada with another woman, after whose death, in the same year, he came to Portsmouth; his wife resided with her parents in Vermont until 1866, when she died.  There is no evidence that either he or his wife obtained a divorce, and the marriage of 1864 was therefore invalid.  The petitioner contends that there is evidence of a marriage between the same parties after the death of Alexander's wife, in May, 1866, and before his marriage to the petitioner on September 11, 1867, so that he then had a wife.  The evidence is, that the parties were married in December, 1864, in New Hampshire, and continued to cohabit until said September 11, and for several years subsequently.  The cohabitation was the only evidence of a marriage after May, 1866.  But cohabitation is not marriage, and, in this case, the cohabitation points only to the illegal contract of marriage under which it commenced.  The parties had no thought of any other marriage.  The testimony of the supposed wife shows this; and the facts that she did not know of the existence of the legal wife, and that Alexander did not know of her death, forbid any presumption that they made a new contract in consequence of it.

It is argued that, in favor of the innocence of the petitioner, the lapse of over eleven years before her marriage to the decedent, during which time she had not seen or heard of Alexander, would afford a presumption that he had obtained a divorce from her.  The circumstances raise no presumption of law that he was divorced, and whatever weight might be given to them alone or aided by other evidence, the evidence in this case will not permit the inference that such a divorce had been obtained.

We are unable to avoid the conclusion that the marriage of Alexander with the petitioner in 1867 was a legal and valid marriage; and that the legal relation created by it was subsisting in 1880.                          *Petition dismissed.**

---

\* See *Williams* v. *Williams*, 63 Wisc. 58.