Stamper *v.* Stanwood.

G. Clifford Stamper *vs.* Milton S. Stanwood.

Middlesex. May 6, 1959. — July 10, 1959.

Present: Wilkins, C.J., Ronan, Spalding, Counihan, & Whittemore, JJ.

*Marriage,* Validity. *Probate Court,* Appeal. *Death.*

On an appeal from a decree of a Probate Court in a proceeding in which all the important evidence is documentary and oral testimony merely explanatory thereof, this court may decide questions of fact unaffected by the findings of the trial judge. [551]

Where it appeared that a woman residing in Nova Scotia went through a marriage ceremony in New Hampshire in 1854 with a man who in 1850 had married another woman from whom he had not been divorced, that the parties to the 1854 marriage lived together as husband and wife in Massachusetts until the man's death in 1899 and had ten children, that the second wife by 1880 knew of the 1850 marriage, and that the whereabouts of the first wife was unknown since shortly after the 1850 marriage and there was no indication of her being alive after 1880, so that she must be presumed dead by 1887, conclusions were warranted that the second wife entered into the 1854 marriage in good faith, that she continued to live with the man as his wife in good faith after the removal of the impediment to their marriage in 1887, and that their marriage became valid in 1887, and their children legitimate, under St. 1895, c. 427; St. 1896, c. 499. [553, 555–556]

In a proceeding in a Probate Court in which the decisive issue was the validity under St. 1895, c. 427; St. 1896, c. 499, of a purported marriage by a ceremony performed in 1854 at a time when the man had not been divorced from another woman whom he had married in 1850, evidence that his first wife had been absent from her marital domicil without explanation since shortly after the 1850 marriage, that her whereabouts thereafter was unknown despite search and inquires, that no record of her death ever was found, and that the last indication of her being alive was in 1880 required application of the presumption that she was dead by 1887, with the result that the impediment to the validity of the 1854 marriage was removed in 1887. [554–555]

PETITION, filed in the Probate Court for the county of Middlesex on May 7, 1957.

The respondent appealed from decrees entered by *Mc-Menimen*, J.

*William S. Monahan*, (*Louis L. Bobrick* with him,) for the respondent.

*Francis B. Turner*, (*James O. Smith* with him,) for the petitioner.

RONAN, J. This is a petition by G. Clifford Stamper for his appointment as administrator of the estate of Walter A. Burnham, the intestate. Against this petition appearances were entered by several persons including the respondent, Milton S. Stanwood. The petitioner then moved to have the appearances struck out. After a hearing, the Probate Court allowed the motion to strike out and appointed the petitioner administrator of the estate. The respondent has appealed.

At stake is his right to share in the estate of the intestate who died in Somerville on May 2, 1957, apparently leaving as heirs and next of kin only first cousins. No question is raised as to the petitioner's relationship to the intestate which he traces through his father's parents, Abbie and William F. Stamper, who were the parents of Esther Stamper Burnham, the intestate's mother and the petitioner's aunt. The respondent is the son of Etta Burnham Stanwood, one of ten children of the union of Margaret Reiter and Alfred Augustus Burnham, and he claims through Alfred and Margaret, who were the parents of Gorham Burnham, the intestate's father and the respondent's uncle. The relationships are set forth in the chart below.

The respondent is one of eight claimants similarly situated, whose claims depend upon the validity of a purported marriage between Alfred and Margaret. See *Parkman* v. *McCarthy*, 149 Mass. 502; *Sanford* v. *Marsh*, 180 Mass. 210; Newhall, Settlement of Estates (4th ed.) § 230. The respondent does not contend that the petitioner was ineligible for appointment as administrator, but claims that, like the petitioner, he was a first cousin of the intestate and entitled to be heard upon the appointment.

Where, as in the present case, all the evidence of substantial importance is documentary and what little oral testimony there is consists almost entirely of explanations and descriptions of the documentary evidence, we are in as good a position as was the probate judge to decide questions of fact. Consequently we may decide such questions upon our own judgment unaffected by the findings below. *Veazie* v. *Staples*, 309 Mass. 123, 127, and cases cited. *Pitman* v. *Pitman*, 314 Mass. 465, 475. *Fiduciary Trust Co.* v. *Mishou*, 321 Mass. 615, 631. *Gally, petitioner*, 329 Mass. 143, 145.

On October 25, 1850, Alfred Augustus Burnham married one Elizabeth Lane at Gloucester, Massachusetts. There were no children of this marriage. There is a record that less than four years later, on April 15, 1854, one Augustus S. Burnum went through a ceremony of marriage with one Margaret Reiter at Nashua, New Hampshire. It is alleged by the respondent, and we agree, that the parties to this marriage were the same Alfred Augustus Burnham and Margaret Reiter who thereafter lived together as husband and wife until the death of Alfred on November 12, 1899, their union resulting in ten children, among whom were Etta Burnham Stanwood and Gorham Burnham, respectively the mother and uncle of the respondent. A copy of the marriage record indicates that "Augustus" gave his residence as Bangor, Maine, and that the residence of Margaret was listed as Guysborough, "N. H." See *Shutesbury* v. *Hadley*, 133 Mass. 242. A careful search revealed that no person with the name of Augustus S. Burnum was residing in or around Bangor, Maine, in 1854. Margaret's residence

was in fact Guysborough, Nova Scotia. Her death certificate shows that she was a native of Guysborough, Nova Scotia; and if the marriage certificate was handwritten the letters "N. S." could easily be mistaken for "N. H." Margaret was also listed as a native of Guysborough on the death certificate of a child of Alfred and herself in 1860. There was no "Guysborough" in New Hampshire. The Massachusetts census of 1855 indicates that a family unit composed of Alfred and Margaret Burnham and a child was living in Gloucester at that time. Margaret's birthplace is designated on it as Nova Scotia. And the census of 1880 shows Alfred and Margaret Burnham and six children living together in Gloucester.

It is not disputed that the 1854 marriage of Alfred and Margaret was bigamous as to him, there being no evidence of the death or divorce of his first wife, Elizabeth. See present G. L. c. 207, § 4; *Commonwealth* v. *Mash*, 7 Met. 472; *Commonwealth* v. *Ross*, 248 Mass. 15, 18–19. In fact there was no evidence of the whereabouts of Elizabeth since shortly after her marriage. It becomes important, then, to determine whether the marriage of Alfred and Margaret subsequently became valid under the provisions of St. 1895, c. 427 (now G. L. c. 207, § 6), which read: "Where a marriage contract has been entered into with due legal ceremony and the parties thereafter live together as husband and wife; and where at the time of such marriage ceremony a former husband or wife of one of the parties was living, and the former marriage with such person was still in force; and where such subsequent marriage contract was entered into by at least one of the parties in good faith, in the full belief that the former husband or wife was dead, or that such former marriage had been annulled by divorce; or without knowledge on the part of one of them of such former marriage; and where the impediment to such subsequent marriage existing by reason of the former marriage is removed by the death of the other party to the former marriage, or by a proper decree of divorce, and the parties to such subsequent marriage then continue living together as husband

and wife in good faith, on the part of at least one of them, they shall be taken and deemed to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be deemed to be the legitimate issue of both parents." By St. 1896, c. 499, this statute was made applicable to cases in which the impediment to the marriage was removed prior to its enactment.

We think that the marriage was entered into by Margaret in good faith. See *Glass* v. *Glass*, 114 Mass. 563; *Lufkin* v. *Lufkin*, 182 Mass. 476; *Gardner* v. *Gardner*, 232 Mass. 253, 258; *Carmichael* v. *Carmichael*, 324 Mass. 118, 121–122; *Fraser* v. *Fraser*, 336 Mass. 597, 600–601. If there were evidence that Margaret had been domiciled in this Commonwealth prior to her marriage and that she married outside the Commonwealth in order to evade our laws, we should be constrained to hold otherwise. See *Levanosky* v. *Levanosky*, 311 Mass. 638; *Fraser* v. *Fraser*, 334 Mass. 4, 7–8. It is significant that Margaret, following the ceremony at Nashua, lived with Alfred in Gloucester as his wife for over forty-five years until his death in 1899, and bore him ten children. See G. L. c. 207, § 47; *Banister* v. *Henderson*, Quincy, 119; *Finer* v. *Steuer*, 255 Mass. 611, 620–621; *Vergnani* v. *Guidetti*, 308 Mass. 450, 456; *Fraser* v. *Fraser*, 336 Mass. 597, 601. These facts are supported by undisputed documentary evidence. Every presumption is in favor of her good faith, *Harding* v. *Townsend*, 280 Mass. 256, 261, see *Gardner* v. *Gardner*, 232 Mass. 253, 257–258, to the end that what has been called "the progressive policy of our law," namely, the "[r]emoval of the obstacles to the legitimation of innocent children, who have no responsibility for the circumstances of their birth," may be effectuated. *Green* v. *Kelley*, 228 Mass. 602, 605. See *Meyers* v. *Pope*, 110 Mass. 314, 316. In the instant case we cannot say that Margaret lacked the requisite good faith on meager evidence of an event which occurred more than a century ago.

Evidence arguably impugning her good faith, however, is found in a ninety-nine year lease from Alfred to the city of Gloucester, executed in 1880, twenty-six years after the

marriage, and a bill in equity brought by Margaret in 1901, about two years after Alfred's death. There was no evidence that Alfred knew of Elizabeth's whereabouts from the time he married her in 1850. Her marriage certificate shows she was married in Gloucester to Alfred on October 25, 1850, and that she was a native of Gloucester. In the lease to the city Alfred referred to her as "my legal wife Elizabeth A. Burnham" and covenanted with the city to obtain a release from her of all claims and interest she had in the demised premises and in the event he did not secure such a release upon her decease to deliver to the city a good and sufficient warranty deed of said premises and further agreed that the city should have peaceful possession of the demised premises during the term of the lease.

Margaret, the second wife, released any claim that she might have to the demised premises. The judge found, and we agree, that Margaret knew at that time, 1880, that Alfred had previously been married to Elizabeth. In 1926 all the descendants of Alfred and Margaret gave a deed of their interests in the demised premises to the city. Margaret died in November, 1914, aged eighty-two years.

As to the bill in equity, Margaret in 1880 purchased a parcel of land in Gloucester in her maiden name which was subject to a mortgage of $2,500 which she assumed. In the same year she gave her husband $2,500 to discharge the mortgage. She alleged in the bill in equity filed in 1901 after his death that he took by mistake an assignment in his own name instead of a discharge of the mortgage. The bill was also brought in her maiden name. The administrator of Alfred was ordered to give a discharge of the mortgage.

We may infer from Alfred's statements in the lease that in 1880 he either believed or suspected that Elizabeth, his first wife, might be alive. She, however, had been absent from her marital domicil without explanation and nothing was known there of her whereabouts. Search failed to reveal any information about her whatever, and inquiries of her niece prior to the trial failed to shed any light upon her

fate. No record of her death in Gloucester or in the Commonwealth has been found. Even if we may properly draw the inference from Alfred's lease that Elizabeth may have been alive in 1880, the state of the evidence would require a presumption that she was dead by 1887, seven years thereafter. *Loring* v. *Steineman*, 1 Met. 204, 211. *Hyde Park* v. *Canton*, 130 Mass. 505, 507. *George* v. *Clark*, 186 Mass. 426. *Turner* v. *Williams*, 202 Mass. 500, 506. *Boston & Roxbury Mill Corp.* v. *Tyndale*, 218 Mass. 425, 428. It is entirely proper to apply the presumption of death from an unexplained absence of seven years in order to remove an impediment to the validity of a ceremonial marriage under the terms of the statute.[1]

The use by Margaret of her maiden name in 1880 suggests that she then knew that she had not in 1854 become the lawful wife of Alfred and possibly also that Elizabeth may have been alive in 1880. It does not, however, show her knowledge of these facts or bad faith in 1854 when she went through the marriage ceremony with him at Nashua.

Assuming, however, as we must, that Margaret knew by 1880 that Alfred had first been married to another, did her knowledge prevent her from acting in good faith thereafter? This precise question has previously been considered by this court in *Hopkins* v. *Hopkins*, 287 Mass. 542. In that case, it appeared that the intestate, whose estate was in issue, had married in New York in 1873. In 1888, while his wife was still alive and the marriage still in force, the intestate came to this Commonwealth and cohabited with one Mary F. Sullivan. Then, in 1905, he and Sullivan went through a ceremony of marriage. His first wife was then alive and undivorced. Sullivan learned for the first time of the first wife in 1907, but she continued to live with him. In 1930 the first wife died and, thereafter, the intestate and Sullivan continued to live together as husband and wife until his death in 1931. Said Rugg, C.J., speaking for the court: "The crucial point then is whether the intestate and Mary

---

[1] The presumption in fact has its origin in matters of marriage and property. See *Cady* v. *Comey*, 10 Met. 459, 461–462.

F. Sullivan continued to live together in good faith on her part after the removal in 1930 of the impediment to the legality of their marriage in 1905. The fact that in 1930 and for some years prior thereto she had known of the existence of the prior marriage does not in our opinion prevent living with him thereafter in good faith" (pp. 547–548). It was held that the marriage of 1905 was validated by the statute from the death of the first wife in 1930. It could have been presumed that Elizabeth was dead by 1887, and since Margaret continued to live with Alfred as his wife until his death in 1899, we see no material distinction between the *Hopkins* decision and the present case. See *Kelly* v. *Drew*, 12 Allen, 107, 110. Compare *Randlett* v. *Rice*, 141 Mass. 385. It is immaterial whether the removal of the impediment was known or unknown. *Turner* v. *Turner*, 189 Mass. 373, 375–376.

Accordingly we hold that the marriage in 1854 was valid, under St. 1895, c. 427; St. 1896, c. 499, from and after 1887, by which date Alfred's first wife Elizabeth is presumed to have died, and that the children of Alfred and Margaret thereby became legitimate.

The allowance of the petitioner's motion to strike was erroneous and is reversed. The respondent is entitled to be heard upon the appointment of an administrator. The decree appointing the administrator is reversed.

*So ordered.*