RANGER INSURANCE COMPANY *vs.* AIR-SPEED, INC. & others.

Middlesex. January 17, 1980. — March 20, 1980.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Insurance,* Aircraft. *Aircraft,* Insurance.

Under a policy of aircraft insurance which provided that, during the time an airplane declared in the policy was withdrawn from normal use for maintenance or repair, the insurance would apply to a similar aircraft temporarily used as a substitute, the insurance company was not liable to passengers who were injured in the crash of an airplane other than that declared in the policy where the passengers failed to prove that the aircraft named in the policy would have been used, if it had been operational, for the particular trip which ended in the accident. [408-410]

An insurance company was not liable to the owner of an airplane under the hull insurance provisions of a policy of aircraft insurance which provided that a newly acquired aircraft would be automatically insured if the owner notified the company within thirty days following the date of its delivery where the owner failed to notify the company of such newly acquired aircraft within thirty days. [410]

CIVIL ACTION commenced in the Superior Court on October 31, 1977.

The case was tried before *Meyer,* J., a District Court judge sitting under statutory authority.

*Harold Jacobi, III (William Trafidlo* with him) for Air-Speed, Inc.

*Abner R. Sisson (Mark L. Murphy* with him) for Arlene Fern, Barrett Greene & others.

*Franklin N. Cunningham* for the plaintiff.

GRANT, J. This is an action brought in the Superior Court by the plaintiff insurance company to secure a declaratory judgment to the effect that the plaintiff is not liable to any of the defendants under the bodily injury or the hull in-

surance provisions of a policy of aircraft insurance (with endorsements) issued by the plaintiff to the defendant Air-Speed, Inc. (Air-Speed), the named insured, covering a Beagle aircraft bearing Federal Aviation Administration (FAA) registration N992M (92M)[1] for the one-year period commencing June 1, 1977. The defendants fall into two groups. One (aircraft defendants) consists of Air-Speed, the holder of an air-taxi/commercial operator (ATCO) operating certificate issued by the FAA under Part 135 of its regulations, and Executive Airlines, Inc. (Executive), the owner[2] and lessor of 92M and of a second Beagle[3] bearing FAA registration N850EX (OEX).[4] The other group (passenger defendants) consists of three passengers who were injured and the heirs and personal representative of one passenger who was killed[5] when OEX crashed[6] in Connecticut on August 11, 1977, in the course of an Air-Speed flight from Hanscom Field in Bedford (BED) to Westchester

---

[1] The letter "N" (pronounced "NOVEMBER") is the prefix assigned by the International Civil Aviation Organization to all aircraft of United States registry. In common parlance, the "N" number is usually shortened by pronouncing only the last three characters, whether they be arabic numerals or letters, because it is those three characters which appear visually on the screens of the automated radar (ARTS II) facilities employed by air traffic controllers and which are often employed in radio voice communications between controllers and pilots. Thus, N992M comes to be pronounced "NINER TWO MIKE."

[2] As it will make no difference in the ultimate result, we shall assume that Air-Speed was the "owner" of 92M for the purposes of the policy. Counsel for the plaintiff conceded that assumption at the argument.

[3] A Beagle is an aircraft of British manufacture which, when properly inspected, qualifies for the issuance of an FAA "standard airworthiness certificate." Those involved in the present case were powered by twin engines of United States manufacture. The seating configurations, the qualifications of Air-Speed's pilots, and the autopilot authorization of the ATCO certificate were such that both aircraft could usually be flown by a single pilot and carry as many as six passengers.

[4] Pronounced "ZERO ECHO X-RAY."

[5] The pilot was also killed.

[6] The cause of the crash is not established on this record. There are indications that at least one of the engines suffered from fuel starvation and that the pilot rejected the controller's advice to land at the nearest airport.

County Airport in White Plains, New York (HPN).[7] Air-Speed and the passenger defendants have entered appeals from a judgment declaring that the plaintiff is not liable to any of the defendants under either the bodily injury or the hull insurance provisions of the policy and its endorsements.

In controversy are the effects which should be given to certain provisions found in an endorsement to the policy and to certain other provisions found in the policy itself. The provisions in the endorsement read as follows: "The Insurer further agrees that, while an aircraft owned by the named Insured and declared in this policy, is withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction, such insurance as is afforded by this policy with respect to such aircraft applies also with respect to another aircraft of similar type, horse-power, and seating capacity, whether or not owned by the Insured, *while temporarily used as the substitute for such aircraft*" (emphasis supplied).[8] It is that provision on which the passenger defendants stake their respective claims. Air-Speed relies on provisions in the policy which read in relevant part as follows: "Automatic Insurance for Newly Acquired Aircraft. If the Named Insured who is the owner of the aircraft ac-

---

[7] Three-letter symbols such as "BED" and "HPN" are known as "location identifiers." They are selected and assigned by the FAA to identify particular airports or an air navigation facility forming a part of an instrument approach to a particular airport. Thus "BED" refers to Hanscom Field at Bedford and also comprises part of the Morse code aural identifier of the instrument landing system (ILS) for Runway 11 at Bedford; "HPN" refers to White Plains and comprises part of the aural identifier of the ILS for Runway 16 at White Plains; "BOS" refers to Logan International Airport at Boston and is the aural identifier of the VORTAC used or useable for making instrument approaches to Runways 15R, 27 and 33L at Boston. That VORTAC is also used for en route navigation.

[8] The insertion of this provision was required by § 298.43(f) of the regulations of the Civil Aeronautics Board. 14 C.F.R. § 298.43(f). It supplanted a provision of the policy entitled "Temporary Use of Substitute Aircraft", which would have provided personal liability insurance when an aircraft not named in the declarations and "not . . . owned" by the insured is "temporarily used as the substitute for such aircraft."

quires ownership of another aircraft certificated as 'Standard' by the [FAA] and so notifies the Company within thirty (30) days following the date of its delivery to him, such insurance as is afforded by this Policy applies also to such aircraft as of such delivery date . . . *This Insuring Agreement does not apply*: (a) unless [such newly acquired aircraft] replaces an aircraft described in this Policy . . ." (emphasis original). The basic question raised by the appeals is whether any of the defendants has sustained his (its) burden of proving coverage under the provisions relied on by him (it). Compare *Mathews* v. *Bloomfield*, 246 Mass. 510, 512 (1923); *Silva* v. *Fid. & Cas. Co.*, 252 Mass. 328, 330 (1925); *Salo* v. *North Am. Acc. Ins. Co.*, 257 Mass. 303, 304 (1926).[9]

The following is a summary of the relevant evidence admitted with respect to both groups of defendants.[10]

OEX and 92M were both owned by Executive and leased to Air-Speed, which used them to transport passengers in both directions between BOS and HPN.[11] Both aircraft were identical for the purposes of this case. Executive had

---

[9] That burden did not shift merely because it was the insurer which initiated the declaratory judgment proceedings. *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 703-704 (1964). *Foley* v. *McGonigle*, 3 Mass. App. Ct. 746 (1975). *Cardarelli Constr. Co.* v. *Groton-Dunstable Regional Sch. Dist.*, 4 Mass. App. Ct. 823, 824 (1976).

[10] The case concerning the passenger defendants was submitted solely on stipulations of counsel and documentary evidence, with the result that we are in a position to evaluate the evidence without regard to the inferences drawn or the findings made by the trial judge. *Stamper* v. *Stanwood*, 339 Mass. 549, 551 (1959). *Bluhm* v. *Peresada*, 5 Mass. App. Ct. 766 (1977). *Brophy* v. *School Comm. of Worcester*, 6 Mass. App. Ct. 731, 733 (1978). Those same stipulations and documents were also admitted in the case concerning the aircraft defendants, together with further documents and certain oral testimony. None of the judge's findings in the case concerning the aircraft defendants is subject to attack under Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), in any area which we regard as material to the proper disposition of Air-Speed's appeal.

[11] The flight which ended in the crash of OEX actually departed from BED rather than BOS, apparently because the weather at BOS had been below IFR (instrument flight rules) minimums when OEX had last returned from HPN.

acquired OEX in December, 1976, and on December 10, 1976, that aircraft was insured in the name of Air-Speed for a one-year period under a policy issued by a company other than the plaintiff and which was cancelled effective May 3, 1977, for nonpayment of premiums. OEX was not put into commercial service immediately, but was kept for some time at the airports in Norwood (OWD) and Worcester (ORH), where it underwent servicing, inspection by the FAA for the issuance of a standard airworthiness certificate, and the installation of avionics. Executive acquired 92M on April 15, 1977, but it was not then put into commercial service. It appears to have spent approximately a month on the ground at OWD undergoing inspections and the installation of equipment.

92M first went into commercial service on the BOS-HPN run on May 17, 1977. There were one or more round trips daily on each business day between that date and May 27, with the number of round trips per day varying from one to three. On May 31, which was the first business day following the Memorial Day weekend, OEX flew from ORH to BOS, flew one passenger to HPN, and returned to BOS without passengers. On June 1, which was the effective date of the policy in controversy, OEX made two round trips with passengers between BOS and HPN. 92M did not fly on either May 31 or June 1, although it appears to have been operational on both days. The operations and maintenance records on both aircraft strongly suggest that the reason for using OEX on both days was that it had less than one-third of the total time in service that 92M had and was encountering fewer maintenance problems.[12]

On June 2 it was discovered that OEX had a fuel leak. It made one round-trip without passengers between BOS and OWD for repairs. On June 3 it was certified as airworthy following a fifty-hour inspection but was then returned to

---

[12] On May 31 the total time in service on 92M was 1839.6 hours, while that on OEX was only 510.2. The total time on 92M when it was taken out of service on July 15 was 1998.4. The total time on the airframe and both engines of OEX at the time of the crash on August 11 was only 545.6.

OWD, where it remained until released after repair of the fuel leak on July 14. 92M flew two passengers from BOS to HPN on the evening of June 2 and returned without passengers. Thereafter, except for three days when it was grounded for engine repairs, it carried passengers on the BOS-HPN run on from one to four round trips each business day through July 13.

On July 14, 92M made nine flights between HPN and BOS.[13] Passengers were carried on all flights except the first flight in the morning (from HPN to BOS) and the last flight in the evening (also from HPN to BOS). On that same day OEX was ferried from OWD to BOS and made an evening flight with passengers to HPN, where it remained overnight. The operations records disclose that at one point on July 14 both aircraft were airborne and carrying passengers at the same time. It will also be noted that at the end of the day Air-Speed had an aircraft at each end of the run, one (92M) in BOS and the other (OEX) in HPN. Air-Speed had known since June (at the latest) that there was no specific insurance coverage on OEX.

On July 15, 92M departed from BOS with two passengers at 7:35 A.M. and arrived at HPN at 8:50 A.M. OEX departed from HPN with three passengers at 8:30 A.M. and arrived at BOS at 9:45 A.M. Once again, both aircraft were airborne and carrying passengers at the same time, with only one of the aircraft specifically insured. 92M returned to BOS without passengers at 11:15 A.M. Tracings of ferrous and nonferrous metals were found in the oil filter and oil sump of the left engine, a sure indication of impending difficulty. 92M was thereupon withdrawn from service; the bad engine was replaced on September 8. OEX continued as the only aircraft in service on the BOS-HPN run between July 15 and the time of the crash on August 11.

1. *The passenger defendants.* It is agreed that 92M was owned by Air-Speed for the purposes of the policy (see note

---

[13] Those were more flights than either aircraft made on any one day while in Air-Speed's possession.

2, *supra*), that 92M and OEX were similar in all material respects, and that on the date of the crash 92M had been withdrawn from service for a reason comprehended by the policy. Accordingly, the only question for decision in the case concerning the passenger defendants is whether OEX was being "temporarily used as the substitute" for 92M within the meaning of the policy at the time of the crash.

The purpose of the quoted provision is to allow the insured to continue his business when the aircraft named in the declarations has to be taken out of service for repairs, or is destroyed. Compare *Central Natl. Ins. Co. v. Sisneros*, 173 F. Supp. 757, 760 (D.N.M. 1959). The provision is not intended to allow the insured to escape paying premiums on another aircraft which is ordinarily used in addition to the one which is named in the declarations. Compare *Lloyds America v. Ferguson*, 116 F. 2d 920, 923 (5th Cir. 1941).[14] We have found no case construing the "substitute" provision of a policy of aircraft insurance. The cases construing analogous provisions of automobile liability insurance policies have uniformly held that the test for coverage under such a provision is whether the vehicle named in the policy would have been used, if it had been operational, for the particular trip which ended in the accident. See, e.g., *Western Cas. & Sur. Co. v. Norman*, 197 F. 2d 67, 68-69 (5th Cir. 1952); *Lumbermens Mut. Cas. Co. v. Harleysville Mut. Cas. Co.*, 367 F. 2d 250, 254 (4th Cir. 1966); *Fulton v. Woodford*, 17 Ariz. App. 490, 495-496 (1972); *Sellers v. Allstate Ins. Co.*, 25 Ariz. App. 482, 485, vacated on other grounds, 113 Ariz. 419 (1976); *Little v. Safeguard Ins. Co.*, 137 So.2d 415, 420 (La. App. 1962); *Lewis v. Bradley*, 7 Wis. 2d 586, 591-593 (1959); *Strozewski v. American Family Mut. Ins. Co.*, 46 Wis. 2d 123, 128-130 (1970). This is a question of fact on which the passenger defendants had the burden of proof, as we have already said.

---

[14] In the typical case, that danger is avoided by requiring that the substitute vehicle be one not owned by the insured. See Annot., Automobile Insurance — Substituted Cars, 34 A.L.R.2d 936, 947, 949 (1954). In the present case, the endorsement to the policy contained no such provision. See note 8, *supra*.

In our judgment they have not sustained that burden.
They have not proved that 92M, if it had been operational
on August 11, would have been on the particular flight
which ended in the crash, or even that it would have been in
use on the BOS-HPN run. All the evidence points in the
other direction. The record discloses that there were only
four days on which both aircraft were operational and avail-
able for commercial service, namely, May 31, June 1, Ju-
ly 14, and July 15. On the first two of those days, OEX
flew but 92M did not; on the latter two of those days, both
aircraft flew. Taken as a whole, the evidence suggests that
it was Air-Speed's plan to use only one of the aircraft when
business was light but to use both aircraft when business re-
quired. The simultaneous use of both aircraft on July 14
and 15 suggests that Air-Speed was not deterred from using
both by the mere fact that only one was specifically covered
by a policy of liability insurance. There is no evidence in
the record as to the extent of passenger demand on Aug-
ust 11; one can only speculate whether one or both aircraft
would have been in use if both had been operational, and
whether it would have been one rather than the other that
would have made the ill fated flight.

We conclude that the judgment is correct so far as it re-
lates to the passenger defendants.

2. *Air-Speed.* There is no question that the judgment is
also correct so far as it relates to Air-Speed. The newly ac-
quired aircraft provision of the policy required Air-Speed to
"[notify] the Company within thirty (30) days following the
date of its delivery to [it]" of any "replace[ment]" for 92M.
The judge quite properly found on the additional evidence
which was introduced in the case concerning the aircraft
defendants that Executive let both aircraft to Air-Speed
under an oral lease which was entered into on June 1, 1977
(the inception date of the policy), and which was reduced to
writing on June 13, 1977. It is obvious from the fact that
OEX flew the BOS-HPN run on June 1 with a total of nine
passengers that the alleged "replacement" was delivered to

Air-Speed not later than that date.[15]  On the record, Air-Speed did not notify the plaintiff that it was using OEX until some time in August.[16]

*Judgment affirmed.*

---

[15] There is not a shred of evidence in the record to support the assertion in Air-Speed's brief that "[OEX] was in disrepair and inoperable prior to July 14, 1977 and in fact was not even delivered to Air-Speed, Inc. until that date."

[16] This disposition of Air-Speed's appeal relieves us of the necessity of deciding whether Air-Speed acquired "ownership" of OEX within the meaning of the policy or whether OEX could properly be found to be a "replacement" for 92M.  If we had to decide the latter question, we would undoubtedly conclude that OEX was not a "replacement" under any of the several tests enunciated in the decided cases.  See, e.g., *Mitcham* v. *Travelers Indem. Co.,* 127 F.2d 27, 29 (4th Cir. 1942); *Hoffman* v. *Illinois Natl. Cas. Co.,* 159 F.2d 564, 565-566 (7th Cir. 1947); *Yenowine* v. *State Farm Mut. Auto. Ins. Co.,* 342 F.2d 957, 959 (6th Cir.), cert. denied, 382 U.S. 830 (1965); *Lynam* v. *Employers' Liab. Assur. Corp.,* 218 F. Supp. 383, 385 (D. Del. 1963), aff'd, 331 F.2d 757 (3d. Cir. 1964); *Iowa Natl. Mut. Ins. Co.* v. *McGhee,* 292 F. Supp. 176, 180 (W.D. Va. 1968), aff'd, 408 F.2d 4 (4th Cir. 1969); *Hames Ready Mix, Inc.* v. *Transit Cas. Co.,* 260 Cal. App. 2d 173, 176-178 (1968); *Greene* v. *Commercial Union Ins. Co.,* 136 Ga. App. 346, 349 (1975); *Continental Cas. Co.* v. *Employers Mut. Cas. Co.,* 198 Kan. 93, 96-98 (1967); *Maryland Indem. & Fire Ins. Exch.* v. *Steers,* 221 Md. 380, 387-388 (1959); *Corbett* v. *Allstate Ins. Co.,* 396 Mich. 103, 105 (1976); *St. Paul Fire & Marine Ins. Co.* v. *Nyquist,* 286 Minn. 157, 160-162 (1970), and cases cited; *National Farmers Union Prop. & Cas. Co.* v. *Nyborg,* 290 Minn. 191, 195 (1971); *Beck Motors, Inc.* v. *Federal Mut. Ins. Co.,* 443 S.W.2d 200, 204-205 (Mo. App. 1969); *Adams* v. *Covenant Sec. Ins. Co.,* 465 S.W.2d 32, 34-35 (Mo. App. 1971); *Merchants Mut. Cas. Co.* v. *Lambert,* 90 N.H. 507, 510 (1940); *Phoenix* v. *Bolton,* 59 App. Div. 2d 464, 466 (N.Y. 1977); *DiMartile* v. *Country-Wide Ins. Co.,* 86 Misc. 2d 36, 39 (N.Y. Sup. Ct. 1975); *State Farm Mut. Auto. Ins. Co.* v. *Shaffer,* 250 N.C. 45, 52 (1959); *Grant* v. *Emmco Ins. Co.,* 295 N.C. 39, 46-49 (1978); *Brescoll* v. *Nationwide Ins. Co.,* 116 Ohio App. 537, 543 (1961); *Lambert* v. *Northwest Ins. Co.,* 268 Or. 317, 321-322 (1974); *Filaseta* v. *Pennsylvania Threshermen & Farmers' Mut. Ins. Co.,* 209 Pa. Super. Ct. 322, 329-330 (1967); *Rowland* v. *State Farm Mut. Auto. Ins. Co.,* 9 Wash. App. 460, 463-467 (1973); *Luckett* v. *Cowser,* 39 Wis. 2d 224, 228 (1968).