BOSTON SAFE DEPOSIT AND TRUST COMPANY, trustee and
executor, *vs.* SEMPLICIO PARIS & another.[1]

Suffolk.   February 15, 1983. — April 25, 1983.

Present: HALE, C.J., KAPLAN, & ARMSTRONG, JJ.

*Trust,* Spendthrift trust, Distribution.  *Conflict of Laws.*

The effect of a certain document executed by the testamentary appointee
of a trust was that the trustee, a Massachusetts trust company, was no
longer at liberty to distribute corpus to the appointee without the con-
sent of a Swiss banking entity. [688-689]
The spendthrift quality of a trust did not extend to the trust corpus after
its testamentary appointment by the original beneficiary and, conse-
quently, the trustee was not entitled to distribute corpus to the ap-
pointee in disregard of an assignment of his interest, of which it had
notice. [689-690]
A person entitled to trust assets under a testamentary power of appoint-
ment could effectively assign these assets before the administration of
the trust and settlement of its accounts were completed. [690]
An instrument assigning to a Swiss banking entity a testamentary ap-
pointee's interest in securities held in Massachusetts by a trust ad-
ministered by a Massachusetts trust company was to be governed by
the law of Massachusetts in view of that jurisdiction's relation to the
transaction and in view of the possibility that Swiss law would not give
effect to the assignment in accordance with intention. [690-691]

CIVIL ACTION commenced in the Probate Court for the
county of Suffolk on November 8, 1974.

The case was heard by *Warner, J.,* on a master's report.

*Gene K. Landy* for Union de Banques Suisses.

*John C. Thomson (Joseph R. Watkins* with him) for the
plaintiff.

KAPLAN, J.   Boston Safe Deposit and Trust Company
(Boston Safe), as trustee under the will of Nellie Parney

---

[1] Union de Banques Suisses.

Carter and executor of the will of Stella Cheremeteff, commenced this action in the Probate Court for Suffolk County seeking instructions about the distribution of the balance of the trust. The defendants Semplicio Paris and Union de Banques Suisses (UBS) answered, each claiming this balance. By counterclaim UBS sought damages against Boston Safe for its having wrongfully made certain prior distributions to Paris. By cross claim UBS sued Paris upon debts owed by him. On Paris's default, UBS had judgment against Paris on the cross claim. The main action was referred to a master, "facts final," with direction not to file a transcript of the evidence with his report. With one modification, the judge adopted the master's report, and entered judgment: (1) That UBS was entitled to the balance of the trust (after expenses, etc.) to discharge, in part, its default judgment against Paris. This is not disputed. (2) That UBS recover from Boston Safe, on the counterclaim, the aggregate of three of the four prior distributions made to Paris. UBS appeals seeking to enlarge the recovery while Boston Safe cross appeals to extinguish it. The judgment is supported by a coherent and reasonably comprehensive master's report, and we affirm it. Although the arguments have ranged widely, decision is relatively short and clear if the findings are accepted as they deserve to be. We resist any attempt to niggle about the findings and thereby to distort their scope or intended meaning.

Under the will of Nellie Carter, a Massachusetts domiciliary who died in 1933, Stella Cheremeteff was made the life beneficiary of a spendthrift trust with a testamentary power to appoint the corpus. Cheremeteff died on January 22, 1969, a domiciliary of the District of Columbia, residing in Italy, and by her will she appointed in favor of Paris, an Italian citizen who had befriended her.

Largely on the strength of his expectations under Cheremeteff's will, Paris solicited and later obtained loans from UBS which in the end resulted in the judgment on the cross claim for more than $250,000, At the start of this process, Paris, on May 20, 1969, executed documents in the Italian

language, of which the main part, called in the record an "attorney power," was (in one translation) a "pledge" by Paris to transfer "all present and future assets derived from my inheritance" to UBS "as a sign of gratitude for that which it will do for the undersigned." Whatever precisely the paper meant, in the entire setting the master found as an ultimate finding that it was not a present assignment; it was "understood by both [Paris] and UBS to be an agreement by [Paris] to make a future assignment of trust assets to UBS." The master found further that in October, 1971, Paris revoked prior instructions as to trust distributions, which would take in the "attorney power" of May 20, 1969.

Because of a will contest, Boston Safe was not appointed executor of Cheremeteff's will until April 22, 1971. On December 23, 1971, it distributed $67,782 in securities to Paris. There was no bar to this distribution at the time, and UBS could base no claim upon it as against Boston Safe.

The situation changed on April 7, 1972. Paris then signed a document in English delivered to both Boston Safe and UBS, confirming that he was indebted to UBS (the amount was then about $106,000); instructing that securities registered in his name should be sent to UBS as security for the indebtedness; and stating that these instructions could not be amended or revoked without the consent of UBS. The sense of this document as it emerged from a developing situation, and whatever its exact characterization, whether as assignment or pledge, was that Boston Safe was not at liberty thereafter to make distributions to Paris without the consent of UBS — distributions which would enable Paris to deal with the avails without regard to his obligations to UBS. Nevertheless Boston Safe without UBS's consent made three such distributions to Paris (May 8, 1972, September 7, 1972, and August 2, 1973) totaling $39,405. Judgment went against Boston Safe in that amount.

Boston Safe tries to justify these distributions on the theory that the spendthrift quality of the trust extended to the corpus even after its appointment by Cheremeteff, so that Boston Safe would be protected in passing it to Paris,

although to their knowledge he had committed himself otherwise to UBS. The master found that Paris's right to receive the principal of the trust was "vested" at the time of Cheremeteff's death. This vesting was by reason of the terms of the Carter will, which called upon the trustee to pay over the fund to Cheremeteff's appointee upon her death. The vested right on Paris's part entailed, as the master further found, a right in Paris to assign his interest before the actual distribution of the assets to him; such an assignment (or equivalent) he did not purport to make on May 20, 1969, but did accomplish on April 7, 1972.

Boston Safe argues that Paris's right to deal with the assets was postponed not merely to the time of the expiration of the period of limitations on claims against Cheremeteff's estate, which occurred in October, 1971, but beyond that to the time of complete administration and settlement of the accounts of the trust, which surely postdated April 7, 1972, and might be very considerably delayed. It would be incongruous, if not against public policy, thus to limit Paris's freedom of action because of spendthrift considerations intended to protect Cheremeteff, not Paris. Paris's right to act so as to bind himself appears, if anything, stronger than that of the beneficiary in Professor Scott's formulation that "where by the terms of the trust a beneficiary is entitled at some future time to receive the principal of the trust estate, and that time has arrived but the trustee had not yet paid the principal to him, a restraint on the alienation of his interest, even if valid up to that time, ceases to be effective." 2 Scott, Trusts § 153, at 1167 & nn. 7 & 8 (3d ed. 1967). This is consistent with Restatement (Second) of Trusts § 153(2) (1957),[2] and is supported, probably prevailingly, by the cases. See, e.g., *Lipsitt* v. *Sweeney*, 317 Mass. 706, 710-711 (1945); *Miles* v. *Miles*, 120 Neb. 436, 444-445

---

[2] "§ 153. Restraint on Alienation of Principal . . . . (2) If the beneficiary is entitled to have the principal conveyed to him immediately, a restraint on the voluntary or involuntary transfer of his interest in the principal is invalid."

(1930); *First Natl. Bank* v. *First Cadco Corp.*, 189 Neb. 734, 738 (1973). But see *Erickson* v. *Erickson*, 197 Minn. 71, 77 (1936), qualified in *Smith* v. *Smith*, 312 Minn. 541, 544-545 (1977).

It is not doubted that Massachusetts law governed Paris's right to assign or otherwise deal with his interest in the trust, as the Commonwealth had the most significant relation to this subject. See Restatement (Second) of Conflict of Laws § 273 (1969); 5 Scott, *supra* § 627. See also *Jenkins* v. *Lester*, 131 Mass. 355, 357-358 (1881). But Boston Safe argues that the law of Switzerland should be used to decide whether the April 7, 1972, document was sufficient as a means of effectuating the particular secured transaction. The master received evidence about Swiss (and Italian) law on the point, see Mass.R.Civ.P. 44.1, 365 Mass. 809 (1974), but he concluded that the foreign law was immaterial: Massachusetts law governed this subject as well as the other, and by that law the instrument was quite sufficient. The. master was right.

There is nothing to the argument that, because two other documents with other purposes that appear in the record refer expressly by boilerplate clauses to Swiss law, the present document, although blank on the point, must be read to make the same reference. See *Brockway* v. *American Exp. Co.*, 171 Mass. 158, 161-162 (1898).

On the true merits, the appropriate law regarding the effectiveness of the document is again to be found on a relational basis. Restatement (Second) of Conflict of Laws § 209 (1969). See generally Goodrich, Conflict of Laws §§ 160-163 (4th ed. 1964). Massachusetts was associated with the security transaction itself in the respects that it was the place where the affected assets were held and were administered as a trust, the place where performance of the transaction must be initiated, and the domicil of the trustee and of the original testatrix. Switzerland could claim contacts as the domicil of the creditor and the likely place of ultimate delivery of the assets. Especially as the factor of the location of the property should be given greater weight

than any other in the total assessment, Massachusetts has the better claim.[3]

If the issue were still thought to be doubtful, that law should surely be chosen which would carry out and validate the transaction in accordance with intention,[4] in preference to a law that would tend to defeat it.[5] See Restatement (Second) of Conflict of Laws §§ 187 comment e; 188 comments b & c; and 244 comments c & j. See also Goodrich, *supra*.

The parties have not considered the possible pertinence of art. 9 of the Uniform Commercial Code, G. L. c. 106, §§ 9-101 et seq. If the statute extended to the transaction, the result would be the same.[6]

Arguments of counsel on other points are recondite but not consequential.

*Judgment affirmed.*

---

[3] This would plainly be true as to ordinary chattels, and "chattelized" property like securities should go by the same rule. See Scoles & Hay, Conflict of Laws § 19.27 (1982); Restatement (Second) of Conflict of Laws § 244 & comment f. Compare *Morson* v. *Second Natl. Bank*, 306 Mass. 588 (1940).

[4] An interesting sidelight appears in the fact that Mr. O. P. Petroff, who drew up the April 7, 1972, instrument for Paris's signature, was found by the master to have become Boston Safe's attorney in Rome after July 1, 1971, to handle the Cheremeteff estates.

[5] It is assumed here that Swiss law would have that negative tendency by holding that an assignment of securities was not effective until physical delivery. But the evidence before the master was not clear whether the Swiss rule would extend to a transaction having important contacts outside the country, particularly when the effect would be, against intention, to deprive a Swiss creditor whose protection would be a matter of governmental interest. Cf. Restatement (Second) of Conflict of Laws §§ 6(2)(c) & 10 (1969).

[6] On coverage, see §§ 9-102(1)(*a*), 9-102(2), 9-105(1)(*i*), 9-201 and 9-203(1) & (2). See also § 9-302(1)(*c*). See generally Scoles & Hay, *supra* § 19.26. On choice of law, see § 1-105 and comments thereto. Compare *Morgan Guar. Trust Co.* v. *Third Natl. Bank*, 400 F. Supp. 383, 388 (D. Mass. 1975), aff'd on other grounds, 529 F.2d 1141 (1st Cir. 1976).