**Sheldon G. ADELSON, Plaintiff,**

v.

**Moshe HANANEL, Defendant.**

**Civil Action No. 04–10357–PBS.**

United States District Court,
D. Massachusetts.

Aug. 7, 2009.

Lauren E. Dwyer, Bruce A. Singal, Do-
noghue, Barrett & Singal, PC, Franklin H.

Levy, Albert P. Zabin, Duane Morris LLP, Boston, MA, Christopher J. Houpt, Mayer Brown LLP, Andrew H. Schapiro, Mayer, Brown, Rowe & Maw LLP, New York, NY, Paul G. Roberts, The Interface Group LLC, Needham, MA, for Plaintiff.

Lawrence G. Green, James A.G. Hamilton, Lynn C. Norton, Burns & Levinson LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This case is about one of the largest casinos in the world, located in Macau. Plaintiff Sheldon Adelson brings this action seeking a declaratory judgment that defendant Moshe Hananel does not retain an option to purchase a twelve percent interest in the casino or any other Adelson venture outside of Israel. Hananel has brought a parallel suit in Israel in which the identical issue, among others, is being litigated. Earlier in the litigation, the First Circuit rejected Hananel's forum non conveniens challenge, and this case was set for trial. At a three-week bench trial which commenced on May 18, 2009, plaintiff introduced the following witnesses: Sheldon Adelson; Daniel Chinn, Interface Partners International's attorney in Israel; Paul Roberts, Vice President and General Counsel of Interface Group Massachusetts; Stephen O'Connor, the Chief Financial Officer of Interface Group Massachusetts and Interface Partners International; Robert G. Goldstein, an employee of Las Vegas Sands, Inc.; George Frederick Kinmonth, an attorney; Jorge Oliveira, the head of Macau's International Law Office; Matthew Ma, the former head of Las Vegas Sands, Inc.'s Asian marketing department; Franklin Levy, Adelson's former personal lawyer and now in-house counsel with Las Vegas Sands, Inc.; William Boyle, the pilot of Adelson's private plane; Frederick Kraus, a lawyer with Las Vegas Sands, Inc.; Lica Brill, a former Adelson employee; and Iris Maimon, a former employee of Interface Partners International. Defendant introduced the following witnesses: Miriam Cohen, a lecturer who worked at Galilee Tours from 1990 to 1998; Max Blankstein, a real estate consultant; David Miro, a personal driver for Hananel while he was employed by Interface; Arik Koubi, one of Adelson's bodyguards; and Moshe Hananel. The Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1. The Back Story

Sheldon Adelson was born in 1933 and grew up in penurious circumstances in Dorchester, Massachusetts. At the age of twelve, Adelson began his business career setting up a newsstand in downtown Boston, and over the course of his early life invested in candy machines, trained as a court reporter, served in the army, became an SEC registered investment advisor, worked in real estate, and became a venture capitalist. He invested in a travel agency in Newton, which still operates and is now called GWV. (Trial Tr. vol. 1, 7–18, May 18, 2009.)

His financial success began with a trade show business called Comdex, a trade show for computers, which became the largest trade show in the world. Having started in Las Vegas, he eventually expanded globally to countries such as Holland and Japan. At some point, the convention in Las Vegas became so successful he needed more space. To develop a convention center, he eventually bought the famous Las Vegas Sands casino and resort, hang out for the Rat Pack. He developed an expo and convention center on the Sands property. Eschewing nostalgia, he eventually tore down the Sands and, in

1999, built a new mega-casino and resort, the Venetian, where the Sands once stood. Now a multi-billionaire, he currently is domiciled in Las Vegas where he resides, votes, and possesses his driver's license. He retains a home in Newton, Massachusetts. (*Id.* at 21–24.)

Adelson owns a warren of businesses informally called the Interface Group. The corporate structure is somewhat complicated. Starting by at least 1989, Adelson and three minority partners controlled a number of businesses. Two of these businesses are Interface Group Nevada, Inc. (which owns the Sands Expo Center and operated Comdex) and Interface Group Massachusetts, Inc. (which primarily runs the travel business and is based in Needham, Massachusetts). A separate business, Las Vegas Sands, Inc. ("LVSI"), was also controlled by the partners and operated the Sands Hotel and Casino. Their employees generally referred to the companies as "Interface" or "The Interface Group." (Trial Tr. vol. 1, 137–141; Trial Tr. vol. 3, 58–68, May 20, 2009; Ex. 71.)

### 2. *Hananel*

Moshe Hananel was born in Israel. After studying medicine for five years, he began to work at Galilee Tours, his father-in-law's travel agency. Together they expanded the business so that it became one of the largest tour operators in Israel. It created large tour packages for Israelis to go to casinos in the Mediterranean. Hananel also developed tours to India and Korea. As part of his tour business, he personally traveled to China and Macau. He had no background in investment, either in high tech or gaming. Hananel is now legally blind and can read only large type or with the aid of a machine.[1] (Trial

Tr. vol. 10, 8–20, 36–38, June 1, 2009; Trial Tr. vol. 11, 82–83, June 2, 2009; Trial Tr. vol. 12, 4–5, June 3, 2009.)

### 3. *Passion for Israel*

A zealous Zionist, Adelson first decided to visit Israel in 1988. After he met Hananel in a travel industry meeting in Boston, Adelson took a three-week tour of Israel, spending almost every day with Hananel and his wife. The trip was life-changing, leaving Adelson torn between lives in the United States and Israel. As a result of this trip, between 1988 and 1995, Hananel and Adelson became socially friendly and grew to trust each other. Adelson made many trips to Israel, and eventually married an Israeli citizen, staying in her family's apartment when he visited. The marriage took place in Israel in 1991. Hananel attended. Hananel also became the godfather to Adelson's son. (Trial Tr. vol. 1, 33–36, 50, 104–105; Trial Tr. vol. 10, 21–25.)

As a way to promote the economy of Israel, Adelson created a National Forum for Israel at the Comdex convention. His brother-in-law, David Farbstein, who had been working with Adelson in Las Vegas, came up with the idea to use contacts from Comdex to begin investing in Israel, which, at the time, was a wellspring of high tech activity. Although initially the business activities were conducted by the Interface Group Massachusetts, in late 1994 Adelson started Interface Partners International, Ltd. (IPI), a Delaware entity, with the primary purpose of investing in high tech companies in Israel. It had offices in Needham, Massachusetts, and in Ramat Gan on the outskirts of Tel Aviv. Employees of Interface Group Massachusetts, like General Counsel Paul Roberts and CFO

---

1. Adelson's attempt to impeach Hananel as exaggerating the degree of his visual impairment, complete with secret surveillance video showing Hananel paging through books and apparently being unable to read them, was notably ineffective.

Stephen O'Connor, provided legal and financial services to IPI, as they did to other Adelson companies. For instance, employees of IPI in Israel were in regular contact with O'Connor regarding budgets and other financial matters. Roberts and O'Connor were also officers of IPI. While there was an IPI sign on the door in Needham, IPI had no employees there, and despite being incorporated in Delaware, never filed to do business in Massachusetts, a requirement for out-of-state businesses doing business here. It was registered to do business in Israel in December 1995 and began its operations in April 1996. (Trial Tr. vol. 1, 26–30; Trial Tr. vol. 3, 63–68, 78–82; Trial Tr. vol. 5, 7, 16–17, May 22, 2009; Trial Tr. vol. 11, 47–58; Ex. 21AA; Ex. 71; Ex. 192; Ex. 358A; Ex. 359A.)

CFO O'Connor reviewed IPI's budget to ensure that its expenditures were appropriate and provided the funding to IPI, but the money trail is quite complicated. Adelson typically paid for its operations out of his personal account directly from his Las Vegas bank to Israel. However, the transaction was treated as an equity contribution to the capital of the Massachusetts "branch" of IPI which then ostensibly lent it to the Israeli "branch." (Trial Tr. vol. 4, 107–127, May 21, 2009.)

In April 1995, as part of a broader series of transactions, Adelson bought out the early partners in IPI and became the sole shareholder of IPI, as well as of LVSI and Interface Group Nevada. Adelson and his partners retained their respective ownership interests in Interface Group Massachusetts. (Trial Tr. vol. 1, 32; Trial Tr. vol. 3, 69–71; Ex. 71.)

Farbstein was to run the business in Israel. Adelson's recollection was that Farbstein was to be paid $80,000 a year, and given the opportunity to be a 10% or 20% co-investor in the investments targeted by IPI. In fact, Farbstein's base salary was $150,000 and the percentage was 25%. Farbstein was required to put up the requisite capital at the time of the closing of the deal. While the focus was supposed to be on high tech investments, IPI looked at other potential investments in Israel and invested heavily in a company called Auto Depot, an automobile parts dealer. (Trial Tr. vol. 1, 29, 41, 57–58, 107–112.)

### 4. *Hiring Hananel with a Handshake*

By June 1995, Adelson concluded that Farbstein was an unsatisfactory employee because he failed to go to work on a regular basis, and had hired a lawyer at IPI, Moshe Melnick, a war hero and Farbstein's friend, of whom Adelson disapproved. Adelson was also dissatisfied with the investment in Auto Depot. Farbstein also failed to staff IPI's office beyond a secretary and Melnick. Hananel tried to resolve the festering family dispute to no avail. At Adelson's request, Hananel fired Melnick in September 1995, at which point Hananel functionally began to manage the office. While Farbstein helped somewhat in the transition, he left the office at the end of November 1995. (Trial Tr. vol. 1, 40, 57–58, 106–107, 118–120, 120–122; Trial Tr. vol. 2, 41–46, May 19, 2009; Trial Tr. vol. 10, 28–45, 83–85; Ex. 297.)

As Hananel remembers the chain of events, Adelson offered him Farbstein's job in August 1995 in Israel. The terms of Hananel's employment were hammered out over several meetings in August in Tel Aviv. Eventually, he accepted the offer. When the deal was complete, they went to a casino in Rhodes for three days with their wives. There they discussed investment ideas for Israel and casino opportunities. Hananel had an office at IPI at least by September 1995. On November 24, 1995, Adelson added Hananel's name to the IPI account. Hananel told Adelson

that he would continue to spend some time at Galilee Tours. (Trial Tr. vol. 1, 47–53; Trial Tr. vol. 6, 18–23, 45–47, May 26, 2009; Trial Tr. vol. 7, 12–19, 27; Trial Tr. vol. 10, 39–62, 81–82; Ex. 297.)

Meanwhile, Hananel, on behalf of Interface, was helping Adelson to explore casino opportunities in Israel and Jordan. Numerous meetings were held in the IPI office with consultants beginning in September 1995. As part of this, LVSI employees in Las Vegas wrote to Hananel for information about building a casino on the border of Israel and Jordan. In November 1995, Hananel and Adelson attended a meeting with the Israeli Land Authority to explore the project. (Trial Tr. vol. 2, 14–37; Trial Tr. vol. 7, 12–45; Trial Tr. vol. 10, 85–86, 97–110; Ex. 216; Ex. 218; Ex. 219.)

In the discussions regarding Hananel's employment, it is undisputed that Adelson and Hananel agreed he would have a salary of $100,000 a year. They also agreed that Hananel would somehow receive 12% of the investments with which he was involved while at IPI, while another friend of Adelson's, Dan Raviv, would receive 8%. He was also to oversee IPI's pre-existing investment in Auto Depot. Adelson and Hananel have different memories of the details of the twelve percent. Adelson testified that they agreed that Hananel would receive 12% of the net profits only of high tech investments in Israel that Hananel found, recommended, and supervised and which came to fruition while he was employed by IPI, but only so long as he remained employed there. Hananel testified that they agreed that he would receive "options" of up to 12 percent on any investment he or the Israeli office "initiated" outside the United States without any other geographic or time limitations so long as Hananel put up the proportionate costs of the investment at any point. (Trial Tr. vol. 1, 48–49, 60–62, 69–70, 77–78, 90; Trial Tr. vol. 10, 45–59.)

During these discussions from August to December 1995, there was no meeting of the minds on this essential term of the contract—how to calculate the twelve percent. Both were close friends, wrote nothing down, and simply never agreed on the details. The circumstances are now further obscured as both understandings of the option term are likely inaccurate.

### 5. *December Trip to Needham*

Adelson testified that the contract was not finalized in Israel, but that he left the negotiation of the final details of the contract for a meeting in Needham with Roberts, whom Adelson describes as "anally meticulous." Adelson had helped Hananel get an appointment at the Joslin Clinic in Boston for his diabetes which was worsening, which Hananel says was the purpose of his trip, not a meeting with Roberts. Hananel stayed at Adelson's home the night of December 4, 1995. On December 5, after his medical appointment, Hananel went to IPI's Needham offices and had a "diabetic lunch" sometime in the late afternoon. Although Adelson and Interface employees claim he arrived much earlier, documents from the clinic indicate Hananel was there until at least 2:43 PM, and thus could not have been in Needham until sometime after 3. What happened at the office is hotly disputed. (Trial Tr. vol. 1, 63–64, 76; Trial Tr. vol. 10, 64–68, 71–78; Ex. 194.)

Roberts testified as follows: Hananel and he met in Roberts' office sometime after lunch. No one else was present. Roberts said he asked Hananel what details he already knew. Hananel mentioned $100,000, health benefits similar to employees of the Needham office, and profit sharing. As instructed by Adelson, Roberts told him it would be a full time job starting

January 1, 1996, and said Hananel had to transition out of Galilee Tours. Hananel said he wanted to continue consulting for Galilee Tours, and Roberts acquiesced. Roberts also told him he would be the head of the Israeli branch of IPI, managing the office and identifying deals within the high tech industry, performing due diligence on investment opportunities, making investment recommendations, and overseeing the portfolio of investments. Hananel could choose his own title. Roberts confirmed the salary would be $100,000, with health benefits, and a 12 percent interest in the net profits pool of the portfolio properties, supposedly all Israeli high-tech companies, so long as the profits were realized while Hananel was employed. The two men discussed the details of the health coverage and Adelson's request for a driver. Per Adelson's instructions, Roberts offered to put the agreement in writing, but Hananel abjured. Roberts points out that other than three casino specialists hired later by LVSI, no Adelson employees had written contracts. (Trial Tr. vol. 4, 8–15.)

Adelson, who had been in New York that morning, said he arrived in the Needham office as the discussions were nearing completion. He testified that Roberts told him the details of the deal, with Hananel present. Adelson added that Hananel was authorized and required to hire analysts to propose and investigate high tech deals. The final hurdle was cleared—Hananel didn't want a company car, but did want a driver—Adelson was happy either way. Hananel and Roberts shook hands on the agreement between Hananel and Interface, with Hananel to start on January 1, 1996. (Trial Tr. vol. 1, 65–68, 88; Trial Tr. vol. 4, 23–24.)

Hananel flatly rejects Roberts' and Adelson's testimony, insisting that the employment contract was never discussed with Roberts at that meeting or at any other time, and testified that his only purpose in going to the office was to meet up with Adelson before the two headed to Adelson's house. (Trial Tr. vol. 10, 62–83.)

Disturbingly, Roberts took no notes, made no memorandum-to-file and wrote no correspondence reflecting the terms of the agreement. This is odd given that Roberts is a lawyer, supposedly an anally meticulous one, and the type of person to keep his yearly diary including the notation indicating that Hananel was coming to the Interface Office for fourteen years. Still, despite a lack of any documentation of the terms, Roberts claims to have a crystal clear memory of them fourteen years later. The Court finds that while a meeting may have taken place, it was at most a rehash of the terms of Hananel's contract, which had already been finalized with Adelson in Israel. (Trial Tr. vol. 4, 13–14; Ex. 1.)

### 6. *Casinos Galore*

Hananel's duties at IPI included investment opportunities in multiple business areas, including casinos. Hananel was also asked to help with Adelson's bank accounts, and managed a large monetary transaction involving Africa–Israel. (Trial Tr. vol. 5, 26–43, May 22, 2009; Trial Tr. vol. 10, 89–90; Trial Tr. vol. 11, 61–62; Ex. 5–E.)

While he was employed at IPI, Adelson and Hananel worked together on the development of four possible casino opportunities in Israel and Jordan. For example, Adelson and IPI sponsored and submitted a proposal to build a casino in a Jordan–Israel Joint Free Tourism Zone. Adelson admits he approved of the submission and met with officials when he visited Israel. A later, more finished version of the submission, for an integrated resort called the "Red Sea Kingdom," had "The Interface

Group" and Hananel's name on its cover page, and contained short bios for both Adelson and Hananel. (Trial Tr. vol. 1, 125–137; Trial Tr. vol. 2, 47–73; Trial Tr. vol. 7, 12–45; Trial Tr. vol. 10, 85–86, 97–110; Ex. 101; Ex. 102; Ex. 154.)

While employed at IPI, Hananel and Adelson traveled to Jordan, Rhodes, Turkey, Cyprus and other areas to explore casino possibilities. A photograph from 1999 shows Adelson and Hananel displaying a presentation on the Red Sea Kingdom to King Abdullah II at the Royal Palace in Jordan. One trip to Milan and other cities was made to find a supplier for glass for the Venetian, then under construction. At a stop in Bulgaria, they met a government official and discussed the possibility of constructing a convention center there. The two men also made a separate trip to Cyprus, where they met with a local construction magnate to discuss the legalization of casinos on the island nation. They also made a trip to Turkey, where they visited various casinos. Adelson disputes that these trips were part of Hananel's obligations at IPI, insisting they traveled together as friends. (Trial Tr. vol. 2, 66–67, 75–83, 84–92; Trial Tr. vol. 10, 111–119; Ex. 363.)

In November 1995, within months of hiring Hananel, Adelson hired a dream team of three experienced casino professionals, Weidner, Stone, and Goldstein to work at LVSI and oversee the construction of the Venetian and develop his casino business. They were given stock options, fifty percent of which vested when the Venetian opened. The other fifty percent vested over the next three years. They expired if the employees were terminated for cause, and for other reasons. The three men had worked together for years developing and managing casinos. (Trial Tr. vol. 3, 73–76; Trial Tr. vol. 4, 98–99;

Trial Tr. vol. 5, 62–65; Ex. 288; Ex. 310; Ex. 311.)

### 7. *Unraveling*

While an employee at IPI, Hananel had multiple responsibilities for Adelson. Many of these tasks involved investing in the high tech industry, but some did not. In 1996, Hananel led IPI to make two investments-one in IMDSoft, which develops patient-monitoring devices for ICUs, and in which IPI still retains an interest, and a second in Denex, which makes software relating to dental implants, and which never realized a profit. Hananel was made the Chairman of the Board of IMDSoft. As part of his responsibilities, he ran a meeting in Andover, MA to discuss a strategic partnership with Agilent Technologies, a subsidiary of Hewlett–Packard. He also worked on the casino projects discussed above. Adelson admits he would call the Interface Group Massachusetts office at least every few months and send regular faxes to the office at least once a month. (Trial Tr. vol. 1, 91–93; Trial Tr. vol. 4, 29–40; Trial Tr. vol. 11, 65–67.)

Hananel did not staff IPI up with analysts, hiring only a lawyer, Mr. Oded Efrat, and a secretary. Adelson claims this was contrary to his instructions. Besides IMDSoft and Denex, Hananel brought no other deals to Adelson which were consummated. (Trial Tr. vol. 1, 53–56; Trial Tr. vol. 4, 34–36.)

Meanwhile, Hananel continued to perform job duties at Galilee Tours. He went to its offices mostly on Fridays. Otherwise, he was at IPI's offices. Adelson was at least generally aware of this work for Galilee Tours, as much of it involved Adelson himself, and his friends, family, or contacts. In 1998, Galilee Tours was sold, and Hananel ceased to perform significant duties there. Beginning in 1999, Adelson

claims he started to discuss firing Hananel because he was producing too few deals. He was fired on April 10, 2000. On May 1, 2000, Adelson sent Hananel a proposal to wind down their relationship. (Trial Tr. vol. 1, 57; Trial Tr. vol. 6, 18–23, 30–42; Trial Tr. vol. 7, 74–75; Trial Tr. vol. 10, 91–97; Trial Tr. vol. 11, 44–45; Ex. 106).

Negotiations extended over a period of months in the end of 2000. In July 2000, IPI's lawyer Daniel Chinn attempted in vain to negotiate the final terms of the separation. The discussions broke down over the terms of a success fee for any casino built in Israel or Jordan, and a disagreement about the technicalities of profit sharing—Hananel believed he was owed 12% of the shares of IMDSoft and Denex at cost; Adelson thought it was 12% of profits. The parties agreed to a success fee in the event that Adelson opened a casino in Jordan or Israel. There were no discussions about any other casinos. The settlement broke down over the details of how long the success fee remained open. Chinn remembers the issue being a difference of a mere six months. The settlement was never finalized. Adelson claims he then learned for the first time that Hananel, without his knowledge, continued to work full time for Galilee Tours and was a no-show at IPI.[2] Adelson said he was "outraged," and the proposal was withdrawn. (Trial Tr. vol. 2, 125–138; Trial Tr. vol. 3, 7–17, 40–41, 49–51; Ex. 285.)

Adelson's stated reasons for firing Hananel and withdrawing this proposal are likely pretextual. He was clearly aware of Hananel's part-time work at Galilee Tours and that Hananel's work at IPI extended beyond high tech and was thus likely to generate fewer deals in that sector. In all likelihood, Adelson fired Hananel because he was done doing business in Israel, having begun to abandon any plans for casinos there or elsewhere in the Middle East, and was turning his attention to other projects and locations, especially in the Far East. At the same time as Adelson fired Hananel, he also fired other IPI employees, the work at IPI was wound down, and the office was effectively closed, although it retained its investments. (Trial Tr. vol. 1, 145; Trial Tr. vol. 3, 8–9, 41–42; Trial Tr. vol. 7, 77; Trial Tr. vol. 11, 44–45.)

## 8. *Macau*

Macau consists of a peninsula and two islands located off the shore of mainland China bordering the Zhuhai region on the China Sea. It is a short ferry ride away from Hong Kong. Macau is the most profitable gaming destination in the world. Macau, once a Portugese colony and now a special administrative region of the People's Republic of China akin to Hong Kong, legalized gambling in the 1960's. Because gambling was illegal throughout the rest of China and much of Asia, Macau became a gambling capital, the "mother lode" of gaming in the words of Mr. Goldstein, an executive with LVSI. Since the 1960's, a powerful man named Stanley Ho had an exclusive license to operate casinos in Macau, operating six casinos and amassing an estimated personal wealth of $50 billion by 1995. There was no opportunity

---

**2.** Both Chinn and O'Connor testified to having frequent contact with Hananel at IPI's office. In addition to the services Hananel provided for Adelson and his associates through Galilee Tours, Adelson saw Hananel numerous times with his van prominently displaying "Galilee Tours" on the side in English and Hebrew. Further, Galilee Tours and Hananel provided touring services to Adelson and the AIPAC commission openly during Hananel's tenure with IPI, including one trip from January 10–17, 1996. GWV, Adelson's travel business, also used the Galilee Tours name in its brochures. (Trial Tr. vol. 3, 20–23; Trial Tr. vol. 5, 8, 25–26; Trial Tr. vol. 6, 30–44; Trial Tr. vol. 7, 73.)

for other casinos to gain a license. (Trial Tr. vol. 5, 78–84; Trial Tr. vol. 8, 31–34, May 28, 2009.)

Macau reverted to China in 1999. As Ho's concession was due to expire at the end of 2001, rumors began to float that Macau might offer other gambling licenses. During this period, Adelson and others on his team visited Asia frequently as part of Las Vegas' ongoing campaign to entice Asian gamblers to spend their money in Vegas instead. (Trial Tr. vol. 9, 10–11, May 29, 2009; Trial Tr. vol. 13, 7, 53–65, June 4, 2009; Trial Tr. vol. 14, 27–41, June 5, 2009.)

Prior to being fired, Hananel had done some work regarding Macau. In 1999, he had been approached by Arieh Lees regarding a project in Zhuhai, a special economic zone of China bordering Macau. At a second meeting, the two discussed Zhuhai and Macau, and Lees provided him with investment guides about Zhuhai. Hananel proceeded to do some research on Zhuhai and Macau and the potential of investing there. At some point, Hananel discussed these ideas with Adelson. He prepared some limited materials on Zhuhai and Macau for Adelson and urged him to visit Macau. Although Adelson did visit Macau, after discussing the matter with his team at LVSI, he was uninterested in investing there, given that its gaming legislation made it impossible for him to build a casino there at that time. (Trial Tr. vol. 7, 84–89; Trial Tr. vol. 10, 119–123; Trial Tr. vol. 11, 4–43; Ex. 100; Ex. 103.)

On August 30, 2001, Macau implemented new gaming legislation to choose three concessionaires by tender. Outsiders would have the capacity to bid. A tender offer was published, inviting companies to pursue gambling licenses. The tender was due on December 7, 2001. On October 16, 2001, William P. Weidner, President and CEO of LVSI filed an Expression of Interest in a Macau gaming concession on behalf of the Venetian. LVSI pushed hard to get the license. It hired an attorney, George Frederick Kinmonth of Paul Weiss, to handle the tender. Weidner and others moved to Macau for six months. Hundreds of consultants and employees were tasked on the bid. In the end, 38 bidders, many with bigger franchises and more famous names, made bids. Asian American Entertainment Corporation Limited made the tender on LVSI's behalf on December 7, 2001. This turned out to be unsuccessful. Eventually, however, LVSI partnered with a London gaming outfit, Galaxy Casino Company, Ltd., which won one of the concessions. LVSI began building in 2003. (Trial Tr. vol. 5, 84–87, 94–95; Trial Tr. vol. 8, 109–113; Trial Tr. vol. 9, 8–9, 12–13, 15, 17–31; Trial Tr. vol. 13, 10–41; Ex. 262.)

Adelson had been to Macau prior to this filing to get business for his Las Vegas activities, to meet people in Macau, and as a stopping point on the way to Hong Kong: on August 29, 1999, March 28, April 1, July 14, July 20, and July 23, 2000 and June 8 and 9, 2001. On one of these trips he met with Mr. Yip at the Lisboa Hotel in Macau. Yip was a cousin of his salesperson Ivy Yip. The other trips were mostly layovers. Adelson's plane was not allowed to land in Hong Kong, so he would fly to Macau and take the ferry to Hong Kong. (Trial Tr. vol. 8, 21–25, 38–45; Trial Tr. vol. 13, 53–65; Trial Tr. vol. 14, 27–41, 43–45; Ex. 97; Ex. 98; Ex. 260.)

In July 2001, Adelson traveled to Beijing to discuss a convention center and the Olympics. The Chinese officials asked him how big a hotel would be if he built one in Macau, even though the issue of Macau was supposedly not on the agenda. Also in 2001, he spoke to a Ms. Wang, purportedly the "richest woman in Asia," to begin discussions for teaming up for a Macau

casino, and together met with the governor of Macau, Edward Ho. On July 16, 2001, Weidner sent a letter to Richard Suen about "mov[ing] forward" on a "very comprehensive casino hotel project" in Macau. Although much of this occurred prior to the change in Macau's laws, it was clearly done in anticipation of the change. That being said, it was not done as a result of Hananel's work, but the substantial work of others, many months after Hananel had been fired. (Trial Tr. vol. 8, 53–64; Ex. 268.)

In May 2004, the Macau Sands, a freestanding casino, opened. Since then, a 200–room tower has been added to the Sands Macau; a second casino modeled after the Venetian, with 3,000 rooms, has opened in Macau; and a Four Seasons, with 350 rooms and a casino, has also opened. The total cost of building to date has been 6.5 to 7 billion dollars. Two other sites are under construction. (Trial Tr. vol. 5, 96–89; Trial Tr. vol. 8, 105–109, 113.)

According to Goldstein, although Hananel was often present at LVSI in Nevada, he never sat in on meetings about Macau or other casino issues. In fact, Hananel and Goldstein never discussed casinos at all. Goldstein was insistent that Hananel had nothing to do with any of LVSI's casino operations, in Macau or elsewhere. Adelson also denies that Hananel ever discussed Macau with him. (Trial Tr. vol. 5, 87–92; Trial Tr. vol. 8, 14–18.)

Danny Raviv and two others bought stock sold by Adelson in LVSI after the Macau venture began and prior to the company going public. Raviv, who was the only third party involved in many of Adelson and Hananel's interactions—working with Hananel in Israel, and with either Hananel and/or Adelson on various casino ventures, in Israel, Jordan, and, most importantly, Macau—was not called as a witness by either side.[3] (Trial Tr. vol. 8, 81–83, 114–118.)

## CONCLUSIONS OF LAW

### A. Personal Jurisdiction

The Court has personal jurisdiction over Hananel. As he is proceeding under a theory of specific jurisdiction, Adelson bears the burden of demonstrating "that the Massachusetts long-arm statute grants jurisdiction over Hananel and that the exercise of that jurisdiction comports with the Due Process Clause of the Fifth Amendment." *Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir.2007) (citing *Foster–Miller, Inc. v. Babcock & Wilcox Can.*,

---

**3.** Although Defendant has requested that the Court draw an adverse inference because Plaintiff did not call Raviv, there is no reason to do so. The burden of proof for such a request is borne by the proponent of the inference. *Steinhilber v. McCarthy*, 26 F.Supp.2d 265, 280 (D.Mass.1998). A party is entitled to an adverse inference because of a missing witness only if that witness is under the "exclusive control" or is "peculiarly available" only to the opposing party. *United States v. Spinosa*, 982 F.2d 620, 632 (1st Cir.1992). An inference will not be made if the witness is "equally available" to both parties. *Id.* Employees have been found to meet these criteria. *Grajales–Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 298 (1st Cir.1999). In this case, however, there is no reason to believe that Raviv was not available to testify if called by the Defendant. Defendant made no effort to call him to testify or to depose him. In this case, where Raviv's testimony would likely cut both ways, the Court is unwilling to allow Defendant the dual benefit of avoiding Raviv's potentially damaging testimony by purposely failing to call him, while simultaneously giving him the benefit of a negative inference for Plaintiff's failure to call him. *Spinosa*, 982 F.2d at 633. Under the circumstances, and given the lack of evidence that Raviv was not available to Defendant, the Court declines to draw a negative inference against either party for failing to call Raviv.

46 F.3d 138, 144 (1st Cir.1995)). Because Massachusetts' long-arm statute is coextensive with the Constitution's limits, the Court can "sidestep the statutory inquiry and proceed directly to the constitutional analysis." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir.2002).

■ As Hananel is an out-of-state defendant, under the Due Process Clause Hananel must have sufficient minimum contacts with the state such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Three considerations drive the minimum contacts analysis: relatedness, purposeful availment, and reasonableness. As the First Circuit has noted:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's instate contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Daynard*, 290 F.3d at 60 (quoting *Foster–Miller*, 46 F.3d at 144).

■ Under the relatedness prong, the claim must "arise out of" or be "related to" activities within the state. *Adelson*, 510 F.3d at 49. It is a "flexible, relaxed standard," *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir.1994), focused on the "nexus between the defendant's contacts and the plaintiff's cause of action." *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 206

(1st Cir.1994). When the claim revolves around a contract, the Court may look to and draw inferences from "the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Daynard*, 290 F.3d at 52 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). In dealing with breach of contract, the Court looks to whether defendant's instate activity was "instrumental either in the formation of the contract or its breach." *See Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir.1999).

■ Although the essential details of the contract and its formation are hotly disputed by the parties, the claim is "related to" in-state activities. Regardless of where and how the contract was formed, the contract resulted in Hananel working for an entity, IPI, which had a Massachusetts office and which received significant assistance from employees of a related Massachusetts-based company, Interface Group Massachusetts. Some of those same employees, based in Massachusetts, also served as directors of IPI. And regardless of the contract's core terms, the parties' actual course of dealing connects the contract to Massachusetts: Hananel was in regular contact with Interface employees in Massachusetts, the money that funded Hananel's work came through Massachusetts, and Hananel's budgets were routinely faxed to the office in Massachusetts for at least some form of approval from one of IPI's officers. This is enough to satisfy the relatedness prong.

■ For similar reasons, Hananel's contacts satisfy the requirement of purposeful availment. To satisfy this prong, Hananel's contacts with Massachusetts must not be merely "random, isolated or

fortuitous." *Sawtelle v. Farrell,* 70 F.3d 1381, 1391 (1st Cir.1995) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). The essential touchstones are voluntariness and foreseeability. *Id.* That is, the contacts with Massachusetts must result from voluntary actions on the part of Hananel, and not from the unilateral actions of another party, *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174, and must be such that the defendant would "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

▇ Here, Hananel sought out and obtained employment with a company with a Massachusetts office, and Massachusetts-based officers, which received substantial assistance from a related Massachusetts-based company, Interface Group Massachusetts. Throughout his employment, Hananel had regular contacts with the employees at the Needham office, including the key officers of IPI. He regularly faxed budgets to the Needham office for approval, and forwarded correspondence for Adelson and sent essential communications to others who worked there. Having sought out such a position, Hananel's contacts with Massachusetts were voluntary, and such a lawsuit in Massachusetts was foreseeable. As such, Hananel's contacts satisfy the requirement of purposeful availment.

▇ Finally, exercising personal jurisdiction over Hananel is reasonable, pursuant to the "Gestalt factors," *Foster–Miller,* 46 F.3d at 144, which are:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*United Elec., Radio, & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992). These factors have remained unchanged since consideration of Hananel's initial appeal. Now, as then, the fact that

Adelson, a resident of the state, has an interest in bringing this action in Massachusetts ... weighs in favor of a finding of personal jurisdiction. And ... Massachusetts has a 'stake in being able to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors.' *Daynard,* 290 F.3d at 62 (quoting *Sawtelle,* 70 F.3d at 1395) (internal quotation marks omitted). The state's interest in the case is further heightened by the involvement of IPI's executive officers who are employed in Massachusetts and of funds which are held and managed in Massachusetts.

*Adelson,* 510 F.3d at 51–52. While the existence of prior lawsuits in Israel (and the technical difficulties involved with witnesses appearing via video teleconference from Israel, Hong Kong, Macau, and Las Vegas) make this case an inefficient burden on the judicial system, this is "insufficient to tip the constitutional balance on the facts of this case." *Id.* at 52. Hananel thus had sufficient minimum contacts with Massachusetts such that this suit does not "offend traditional notions of fair play and substantial justice," and this Court has personal jurisdiction over Hananel.

**B. Burden of Proof**

▇ Despite the fact that Adelson initiated this lawsuit, it is Hananel that carries the burden of proof. In diversity actions like this one, Massachusetts law determines which party bears the burden of proof. *Palmer v. Hoffman,* 318 U.S. 109,

117, 63 S.Ct. 477, 87 L.Ed. 645 (1943).[4] Courts are split over the question of which party bears the burden of proof in a declaratory action. 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2770 (3d ed. 1998). The problem arises because the parties in declaratory actions are typically reversed; that is, brought as a normal breach of contract action, this case would feature Hananel as the plaintiff and Adelson as the defendant. Some courts have ruled that the burden should not shift merely because the potential defendant has become the nominal plaintiff; other courts have ruled that whichever party institutes a suit must bear the burden of proof. *Id.*

■ Although Hananel argues to the contrary, the Massachusetts Supreme Judicial Court has sided with those courts that have ruled that the burden should not shift merely because the potential defendant has become the nominal plaintiff. In a declaratory action focused on a breach of lease, the court noted that:

> [h]ad the lessors brought an action for damages for breach of an implied covenant to continue operations they would, of course, have had the burden of showing the covenant. That the lessee initiated the proceeding for declaratory relief does not shift that burden to the lessee. We reject the view urged by some commentators that, having selected the forum and time of suit, the plaintiff in declaratory proceedings should have the burden of going forward and of persuasion.

*Stop & Shop, Inc. v. Ganem,* 347 Mass. 697, 703–04, 200 N.E.2d 248 (1964) (internal citations omitted). The Supreme Judicial Court appears not just to have reject-

ed shifting liability to the plaintiff in a particular subset of declaratory actions, but to have rejected the concept entirely. Moreover, even if the rejection were narrower, the circumstances here would still be covered, given that both *Ganem* and this case concern allegations of breach of contract.

The Massachusetts Appeals Court has followed *Ganem* and refused to shift the burden of proof in declaratory actions in other contexts as well. *See Ranger Ins. Co. v. Air–Speed, Inc.,* 9 Mass.App.Ct. 403, 401 N.E.2d 872, 875 n. 9 (1980) (citing *Ganem* and stating that the "burden did not shift merely because it was the insurer which initiated the declaratory judgment proceedings" in the insurance context); *Camp Dresser & McKee, Inc. v. Home Ins. Co.,* 30 Mass.App.Ct. 318, 568 N.E.2d 631, 633 (1991) (same); *Foley v. McGonigle,* 3 Mass.App.Ct. 746, 326 N.E.2d 723, 724 (1975) (citing *Ganem* and stating that the "fact that the plaintiff initiated this proceeding for declaratory relief does not shift th[e] burden to him" in the context of easement disputes); *Cardarelli Constr. Co. v. Groton–Dunstable Reg'l Sch. Dist.,* 4 Mass.App.Ct. 823, 349 N.E.2d 383, 384 (1976) (citing *Ganem* and stating that "[i]t is well settled that a party asserting the illegality of a contract has the burden of proving the facts necessary to establish such illegality. The burden is similarly placed in the case of a public contract allegedly invalid by reason of noncompliance with statutory bidding procedures and the fact that the vehicle whereby the bid and contract were challenged was a bill for declaratory relief did not relieve the plaintiff of that burden.") (internal citations omitted).

---

4. Although the parties disagree as to who bears the burden of proof under Massachusetts law, both parties have asserted that it is Massachusetts law, and not some other sovereign's law, such as Israel's, that governs the question.

Hananel cites only two cases to support his claim that the plaintiff in a declaratory action always has the burden of proof. Both citations are misguided. One, *Cardarelli*, as noted above actually relies on *Ganem* to restate the position that the burden of proof is not shifted in a declaratory action; while the plaintiff in that case bore the burden of proof, it would have borne the burden in a non-declaratory action as well. The other, *Shell Oil Co. v. City of Revere*, 383 Mass. 682, 421 N.E.2d 1181 (1981), a declaratory action where the plaintiff bore the burden, is a constitutional case, and as the court in *Ganem* stated, such cases "are consistent with our holding. In those cases the petitioners seeking declarations . . . that zoning regulations were unconstitutional had the burden because of the presumption of constitutionality." *Ganem*, 347 Mass. at 704, 200 N.E.2d 248. As the party who would have had the burden of proof in a non-declaratory action, the burden of proof is on Hananel.

## C. Governing Law

The parties dispute what law governs the contract. Adelson asserts that it is Massachusetts law which applies; Hananel argues that the applicable law is Israeli law. The parties agree that Israeli contract law and Massachusetts law are, for the purposes of this case, identical with one important exception: Massachusetts contract law has a statute of frauds which Adelson argues would bar enforcement of the contract as Hananel describes it, whereas Israeli contract law has no statute of frauds.

■■■ When a federal court's jurisdiction arises from diversity of citizenship, as it does here, the court applies "the substantive law of the forum in which it sits, including that state's conflict-of-laws provisions." *Dykes v. DePuy, Inc.*, 140 F.3d 31, 39 (1st Cir.1998). This Court thus applies Massachusetts' conflict-of-laws provisions. In a contract case, Massachusetts applies a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985); *see also Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 30 (1st Cir.1997) (applying *Bushkin*). The functional approach to choice of law issues "is explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." *Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass.App.Ct. 492, 803 N.E.2d 750, 752 (2004) (citing *Bushkin*, 393 Mass. at 632, 473 N.E.2d 662).

The general Restatement factors concern the needs and interests of the interstate and international systems, the relevant policies of the forums and field of law and the protection of justified expectations. *Restatement (Second) of Conflict of Laws* § 6(2) (1971). In contract disputes, the law chosen should be the law with the "most significant relationship to the transaction and the parties." *Id.* § 188(1). To determine that, the Court is to consider factors including the place of negotiation, the place of contracting, the place of performance, and "the domicil[e], residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2).

■■■ The contract was negotiated almost exclusively in Israel. The essential terms were hammered out through meetings between Adelson and Hananel in Israel. Adelson claims that the final details were discussed in the Needham office. The Court finds neither Adelson nor Roberts' testimony credible on that front, and even if it did, Adelson only claims that the final details, and not the bulk of the contract terms, were negotiated there. As

such, the place of negotiation and place of contracting weigh in favor of applying Israeli Law.

The place of performance was different and varied for each party. Although Hananel's performance at IPI was primarily in Israel, he also performed significant work in Jordan, and some additional work in various European countries, Massachusetts, and Nevada. Although IPI performed some work in Massachusetts, it also hired and paid for support staff, workspace, and a driver for Hananel in Israel. Adelson's performance, including authorizing and funneling money to IPI, sometimes through the Needham office and sometimes not, occurred primarily in Nevada, but also internationally. The place of performance thus tilts in favor of applying Israel's laws.

The domicile of the parties favors Israel. IPI's principal place of business was Israel. *Id.* § 188 cmt. e ("At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state."). Hananel's domicile is Israel. Adelson's domicile, on the other hand, is Nevada.

As a general matter, consideration of the jurisdiction with the "most significant relationship to the transaction and the parties," favors Israel. The contract was negotiated primarily in Israel. At the time, Hananel resided in Israel and Adelson was a very frequent visitor there. While IPI had an office in Massachusetts, its primary place of business was to be Israel, all of its full-time employees were located there, and its work was intended to be and primarily was related to investments in Israel. The contract outlined Hananel's job requirements, which were to run IPI's office in Israel. The vast majority of his work was to be done there. Almost none of it was to be done in Massachusetts. Israel's relationship to the transaction and the parties was far greater than Massachusetts', and bore the most significant relationship of any jurisdiction.

The Restatement factors thus come down strongly in favor of applying Israeli law. Were the case closer, Israeli law would still prevail, as Massachusetts substantive law holds that "[w]here relevant contacts and considerations are balanced, or nearly so, we are inclined to resolve the choice by choosing that law 'which would carry out and validate the transaction in accordance with intention, in preference to a law that would tend to defeat it.'" *Bushkin*, 393 Mass. at 635, 473 N.E.2d 662 (quoting *Boston Safe Deposit & Trust Co. v. Paris*, 15 Mass.App. Ct. 686, 447 N.E.2d 1268, 1271 (1983)). *See also* Restatement (Second) of Conflict of Laws § 188, cmt. b (stating that "[p]arties entering a contract will expect at the very least, subject perhaps to rare exceptions, that the provisions of the contract will be binding upon them. Their expectations should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied.") Thus were this case closer than it is, the fact that Israeli law, without a statute of frauds, would "validate the transaction in accordance with intention" would also militate in favor of applying Israeli law.

Although the interests of the United States generally support application of Massachusetts law, given Adelson's citizenship, and the fact that his affiliated companies are located in and governed by United States laws, these interests are not enough

to make Massachusetts law the appropriate choice, given the numerous factors weighing in favor of applying the law of Israel. As such, the Court applies Israeli law.[5]

### D. Terms

 It is black letter law that for a contract to exist, there must be a "meeting of the minds." "Failure of the parties to agree on the essential terms of a contract precludes the existence of an express contract." *Fraser & Wise, P.C. v. Primarily Primates, Inc.*, 966 F.Supp. 63, 76 (D.Mass.1996). "There must be agreement on the essential terms of the transaction in order that the nature and extent of the parties' obligations can be determined and, hence, enforced." *Novel Iron Works, Inc. v. Wexler Const. Co., Inc.*, 26 Mass. App.Ct. 401, 528 N.E.2d 142, 146 (1988). *See also Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F.Supp. 404, 418 (D.Mass.1995) (stating that "the parties['] failure to agree on material terms militates against the finding of a contract"). As to the extent and meaning of the term at the center of the dispute, the option in projects initiated by Hananel, it is clear that there was simply no meeting of the minds. Hananel intended the option to extend to almost any project he could imagine; Adelson intended the option to cover a narrower category of work. Adelson's claim that he and Roberts specifically outlined, in well-tailored detail, that the option applied only to high tech investments, and that Hananel needed to remain at IPI until the investments realized their profits, is not credible. Likewise, Hananel's claim that Adelson intended the option to cover literally any idea Hananel ever brought up to him (with the incongruous exception of ventures in the United States) is also not credible. But it is clear that the parties simply did not discuss this issue sufficiently to reach a true agreement as to its meaning. Under the circumstances, too many essential details were left undecided to find that the term was anything but too vague and indefinite to be unenforceable. *See Held v. Zamparelli*, 13 Mass.App.Ct. 957, 431 N.E.2d 961, 962 (1982); *Mass Cash Register*, 901 F.Supp. at 417.

Were the Court to attempt to supply a reasonable interpretation of the option term under the circumstances, despite the fact that the parties failed to agree to the necessary specifics, *see President & Fellows of Harvard Coll. v. PECO Energy Co.*, 57 Mass.App.Ct. 888, 787 N.E.2d 595, 601 (2003), Hananel still would not prevail. Under the circumstances, reasonable terms regarding the scope and requirements of the option clause could not possibly be expansive enough to include Hananel's work on the casino in Macau. A reasonable term would have required at least as much work on Hananel's part as was expected of his high tech investments—or any other principal at an investment firm—that he not only recognize an opportunity, but also that he do sufficient background research to provide a detailed recommendation of the opportunity to IPI, as well as oversee at least the beginning of IPI's investment in the venture. Although Hananel may have come up with the idea of building a casino in Macau, and even recommended the venture and provided Adelson with some materials related to it, his work would have been insufficient to fulfill any reasonable requirements for such work which the Court might provide.

**5.** Because the parties agree that Israeli contract law is identical to Massachusetts contract law, but without a statute of frauds, the Court will apply Israeli law by applying Massachusetts law in all other respects.

Furthermore, even were the Court to accept Hananel's version of the option as covering any venture "initiated" by Hananel, he still would not be entitled to an interest in the Macau casino. "Initiate" means "[t]o set going by taking the first step; begin." *The American Heritage Dictionary of the English Language* (4th ed. 2009). In Hananel's best case, he came up with the idea for building a casino in Macau, suggested the idea to Adelson, did some research on Macau, and hastily prepared some materials for Adelson. While this might make the venture Hananel's idea, it is insufficient to constitute initiating the investment, under any reasonable understanding of the term. Hananel's actions were not the "first step" or even the "begin[ning]" of the venture, but only the first thought concerning the venture, or the first step to beginning to consider the venture. In fact, it was not until many months after Hananel was fired that it would have been possible for anyone to initiate a casino venture in Macau—at the time, the law of Macau did not allow Adelson (or anyone other than Mr. Ho) to build a casino there, and any steps in anticipation of building a casino would have been significantly premature. Thus not only did Hananel fail to take sufficient action to initiate the Macau casino, given the timing of his actions, it would not have even been possible for him to initiate it. Hananel may have gotten Adelson's wheels spinning, but he never got anything in gear. Thus even if the parties minds had met, and they had met in the way Hananel claims, his actions still would not have entitled him to options in the Macau casino.

**ORDER**

Based on the findings above, the Court enters judgment for Plaintiff declaring that the Defendant does not hold an option to purchase 12% of Plaintiff's interest in the Macau casino.